IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DUSTIN WELLER, Derivatively on Behalf of INOGEN, INC., <br><br>               Plaintiff, <br><br>v. <br><br>SCOTT WILKINSON, ALISON K. BAUERLEIN, HEATH LUKATCH, RAYMOND O. HUGGENBERGER, BENJAMIN M. ANDERSON-RAY, SCOTT A. BEARDSLEY, LOREN L. MCFARLAND, HEATHER D. RIDER, R. SCOTT GREER, <br><br>               Defendants, <br><br>and <br><br>INOGEN, INC., a Delaware corporation, <br><br>               Nominal Defendant. | Civil Action No. <br><br><br><br><br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT** <br><br><br><br>JURY DEMAND |

Plaintiff Dustin Weller ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Federal Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment, derivatively on behalf of and for the benefit of Nominal Defendant Inogen, Inc. ("Inogen" or the "Company").  Plaintiff makes these allegations upon personal knowledge as to those matters concerning himself, and, as to all other matters, upon the investigation of counsel, which includes without limitation: (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases, news reports, analyst reports, industry reports, investor conference call transcripts, and other information available in the public domain; and (iii) review and analysis of filings in federal court, including pleadings in the related securities fraud class action, *In re Inogen, Inc. Sec. Litig.*, C.A. 2:19-cv-01643-FMO-AGR (C.D. Cal.) filed March 6, 2019 (the "Securities Class Action").

## I.        NATURE AND SUMMARY OF ACTION

1.        This is a stockholder derivative action brought on behalf of and for the benefit of Inogen that seeks to redress wrongdoing by the Company's board of directors (the "Board") and certain of its senior officers. From at least November 7, 2017 and continuing through the present (the "Relevant Period"), the Individual Defendants (defined below) breached their fiduciary duties owed to Inogen and its stockholders and committed other violations of state and federal law by, *inter alia*, causing the Company to issue materially false and misleading statements and/or omit material information from its public filings and communications with analysts and investors, the disclosure of which would have made such filings and communications not misleading.  By and through the Individual Defendants' violations of law, Inogen has sustained and will continue to sustain damages, including billions of dollars in losses to the Company's market capitalization, as

well as significant harm to its reputation, goodwill, and standing in the business community. Moreover, the Individual Defendants' wrongdoing has exposed the Company to hundreds of millions of dollars in potential liability from the Securities Class Action, and the significant costs incurred (and to be incurred) in connection with the litigation and potential resolution of that action.

2.     Inogen is a medical technology company that primarily develops, manufactures, and markets portable oxygen concentrators (sometimes referred to as "POCs") for patients, physicians (and other clinicians), and third-party payors in the United States and internationally. In 2017, the Company proclaimed itself as "the leading worldwide manufacturer of portable oxygen concentrators." The Company offers both portable and stationary devices that deliver supplemental long-term oxygen therapy ("LTOT") to patients suffering from chronic respiratory conditions. The Company derives its sales primarily through its three business segments: (i) direct-to-consumer ("DTC"); (ii) domestic business-to-business ("B2B"); and (iii) international.

3.     Throughout 2017 and 2018, Inogen attempted to distinguish itself from other U.S. oxygen therapy providers by expanding and focusing it sales efforts on higher margin, cash DTC sales. The results of this effort appeared impressive and, according to Inogen's senior management, were attributable to the acumen of its then-rapidly expanding salesforce. But this was a lie. Even though long-term oxygen therapy via rental of Inogen's POCs is an approved Medicare expense, the Company's sales representatives were trained to deceive sick and often elderly customers into paying the premium retail price out-of-pocket to purchase a POC device. The Individual Defendants concealed from investors that the revenues from these misleading "higher margin, cash DTC sales" would not be sustainable.

4.     The Individual Defendants also caused the Company to falsely portray the potential size of the POC market and the associated growth opportunities available to the Company.  The Individual Defendants conveyed that Inogen's Total Addressable Market ("TAM") for its devices was three million patients and growing at a rate of 7% to 10% per year.  However, this estimate was based on distortions of Medicare and other unreliable data, including overstated estimates of the number of patients with Chronic Obstructive Pulmonary Disease ("COPD"), the primary indication for long-term oxygen therapy patients.  The Individual Defendants furthered this narrative of the largely untapped potential market by falsely claiming that only a small portion of the TAM, in the range of 7% to 12%, was already penetrated by portable oxygen concentrator devices.  Given this enormous opportunity, the Individual Defendants conveyed that by adding additional sales representatives and increasing its marketing budget, Inogen would generate additional sales at the same rates as its previous infusions of sales and marketing investments.

5.     During the Relevant Period, the Individual Defendants caused Inogen to make false and misleading representations to the public regarding the purported strength of its business metrics and growth opportunities.  Specifically, the Individual Defendants failed to disclose the following adverse facts ("Undisclosed Facts"), among others, in order to mislead investors:

(a)     that the size of and growth rate of Inogen's TAM was overstated and the underlying basis for calculating TAM was flawed;

(b)     that POC market penetration was only 6% to 12%, and that potential POC penetration would be 90% of the ambulatory supplemental LTOT market and 65% of the overall LTOT market;

(c)     that the growth in Inogen's DTC sales was misleadingly attributed to the strong sales acumen of the Company's salesforce when it really was due in large part to

abusive sales tactics designed to deceive the Company's sick and predominantly senior customer base;

(d)      that Inogen was facing a serious risk of losing its Medicare license due to existing fraudulent and abusive sales tactics;

(e)      that Inogen could not abandon the significantly larger Medicare reimbursement rental market while continuing to sustain its sales growth;

(f)      that the growth opportunity for its B2B sales to home medical equipment ("HME") providers was overstated, as it was inflated, unsustainable, and would necessarily erode DTC sales;

(g)      that Inogen lacked effective controls necessary to: (i) prevent misconduct by its growing sales staff and its distributors; (ii) protect the integrity of the public statements made by and on behalf of the Company; (iii) stop its employees and directors from violating its Code of Ethics and Conduct; and (iv) ensure compliance with all applicable laws and regulations; and

(h)      as a result of the foregoing, statements about the Company's business operations, financial health, growth prospects, and the adequacy of its internal controls, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

6.      The Individual Defendants' misconduct did not end there.  During the Relevant Period, Inogen's Board authorized the filing of proxy statements with the SEC—specifically, the 2018 and 2019 Proxy Statements—which also failed to disclose, *inter alia*, the true size and scope of Inogen's TAM for its oxygen concentrators; the true basis for its TAM determinations; that the Company's sales success was misattributed to the skill of its salesforce, when the true reason lay in dishonest sales techniques used to manipulate customers to pay Inogen's higher prices; that

Inogen's reported growth in B2B domestic sales to HME suppliers was exaggerated and unsustainable, and that such growth harmed its direct-to-consumer sales growth; that proportion of the Company's sales attributable to Medicare's steadier market was overstated; and Inogen failed to maintain adequate internal controls.

7.      When the full extent of the Company's false and misleading statements eventually came to light, Inogen's stock price declined by a shocking 78% between November 6, 2018 and August 7, 2019, representing a loss of more than ***$3.3 billion*** in market capitalization.

8.      Company insiders, on the other hand, did not fare as poorly.  Prior to these disclosures, with knowledge of the adverse, material nonpublic information, certain of the Individual Defendants unloaded approximately 291,250 shares of Company stock at artificially inflated prices, pocketing over $43.9 million in unlawful profits.

9.      As a direct result of this unlawful course of conduct, the Company is now the subject of the Securities Class Action.  The Securities Class Action asserts claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Inogen and the several of its top executives in connection with the Company's improper and misleading statements.

10.     The Board has not, and will not, commence litigation against the Individual Defendants named in this complaint, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to Inogen for authorizing or failing to correct the false and misleading statements alleged herein, and for failing to correct and/or implement the necessary policies procedures, and internal controls to prevent the harm to the Company that has occurred. Accordingly, a pre-suit demand upon the Board is a useless and futile act.  Thus, Plaintiff rightfully

brings this action to vindicate the Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Inogen and its stockholders.

## II.      JURISDICTION AND VENUE

11.     Pursuant to 28 U.S.C. § 1331 and section 27 of the Exchange Act (15 U.S.C. § 78aa), this Court has jurisdiction over the claims asserted herein for violations of sections 14(a) and 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over each defendant because each defendant either (i) is a Delaware corporation conducting business and maintaining operations in this District, (ii) has expressly or implicitly consented to personal jurisdiction through, among other things, a forum selection clause, or (iii) is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this jurisdiction pursuant to section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) because Inogen is a Delaware corporation.

## III.     PARTIES

### A.      Plaintiff

14.     Plaintiff Dustin Weller is a current stockholder of Inogen and has continuously owned shares in the Company since December 2016.

### B.    Nominal Defendant

15.    Nominal Defendant Inogen is a Delaware corporation with its principal executive offices located at 326 Bollay Drive, Goleta, California 93117.  Since the Company's incorporation on November 27, 2001, it has been primarily engaged in the development, manufacture, and sale of portable oxygen concentrators for the treatment of chronic respiratory conditions.  As of July 31, 2019, the Company had approximately 21,933,758 shares outstanding.  The Company's common stock trades on the NASDAQ Global Select Market under the ticker symbol "INGN."

### C.    Individual Defendants

16.    Defendant Scott Wilkinson has served as Inogen's Chief Executive Officer ("CEO") since March 2017 and as a director of the Company since January 2017.  He previously served as Inogen's President and Chief Operating Officer ("COO") from January 2016 until March 2017, and Executive Vice President of Sales and Marketing from approximately 2008 to 2015.  Wilkinson is named as a defendant in the related Securities Class Action.  Wilkinson knowingly, recklessly, and/or with gross negligence made (or caused to be made) improper statements in Inogen's press releases, public filings, and other public statements about Inogen's business metrics, growth opportunities, and the adequacy of its internal controls.  Wilkinson also violated section 14(a) of the Exchange Act by negligently making misleading statements in the Company's 2018 and 2019 Proxy Statements.  According to the 2019 Proxy Statement, as of March 15, 2019, Wilkinson beneficially owned 209,733 shares of the Company's common stock or approximately $19.9 million in Company stock.  Additionally, while the price of Inogen stock was artificially inflated, and while Wilkinson was in possession of material, adverse nonpublic information about the Company as alleged herein, he sold 57,037 shares of his personally-held Company stock, for which he received $8,555,054.  His insider sales, which were made before certain of the Company's material misstatements and omissions were exposed, establish, in part,

his motive in facilitating and participating in the scheme to cheat the Company and its stockholders. In 2017 and 2018, Inogen paid Wilkinson total compensation of $2,848,366 and $2,687,338, respectively.

17.   Defendant Alison K. Bauerlein, who is one of the Company's founders, has served as Inogen's Chief Financial Officer ("CFO") since 2009 and Executive Vice President, Finance since 2014. Bauerlein is named as a defendant in the related Securities Class Action. Bauerlein knowingly, recklessly, and/or with gross negligence made (or caused to be made) improper statements in Inogen's press releases, public filings, and other public statements about Inogen's business metrics, growth opportunities, and the adequacy of its internal controls. According to the 2019 Proxy Statement, as of March 15, 2019, Bauerlein beneficially owned 217,685 shares of the Company's common stock or approximately $20.7 million in Company stock. Additionally, while the price of Inogen stock was artificially inflated, and while Bauerlein was in possession of material, adverse nonpublic information, she sold 84,260 shares of her personally-held Company stock, for which she received $10,578,748. Her insider sales, which were made before certain of the Company's material misstatements and omissions were exposed, establish, in part, her motive in facilitating and participating in the scheme to cheat the Company and its stockholders. In 2017 and 2018, Inogen paid Bauerlein total compensation of $1,157,236 and $1,242,433, respectively.

18.   Defendant Heath Lukatch has served as Chairperson of the Board of the Company since 2008, as a director since 2006, and as a member of the Compensation, Nominating and Governance Committee ("CN&G Committee") since at least 2013. Lukatch knowingly, recklessly, and/or with gross negligence made (or caused to be made) improper statements in Inogen's press releases, public filings, and other public statements about Inogen's business metrics, growth opportunities, and the adequacy of its internal controls. Lukatch also violated

section 14(a) of the Exchange Act by negligently making misleading statements in the Company's 2018 and 2019 Proxy Statements.  According to the 2019 Proxy Statement, as of March 15, 2019, Lukatch beneficially owned 33,318 shares of the Company's common stock or approximately $3.2 million in Company stock.  Additionally, while the price of Inogen stock was artificially inflated, and while Lukatch was in possession of material, adverse nonpublic information, he sold 8,000 shares of his personally-held Company stock, for which he received $1,248,309.  His insider sales, which were made before certain of the Company's material misstatements and omissions were exposed, establish, in part, his motive in facilitating and participating in the scheme to cheat the Company and its stockholders.  In 2017 and 2018, Inogen paid Lukatch total compensation of $435,618 and $296,238, respectively.

19.     Defendant Raymond O. Huggenberger has served as a director of the Company since 2008.  He previously served as Inogen's President from January 2008 until January 2016, and as the Company's CEO between January 2008 and March 2017.  Huggenberger knowingly, recklessly, and/or with gross negligence made (or caused to be made) improper statements in Inogen's press releases, public filings, and other public statements about Inogen's business metrics, growth opportunities, and the adequacy of its internal controls.  Huggenberger also violated section 14(a) of the Exchange Act by negligently making misleading statements in the Company's 2018 and 2019 Proxy Statements.  According to the 2019 Proxy Statement, as of March 15, 2019, Huggenberger beneficially owned 89,584 shares of the Company's common stock or approximately $8.5 million in Company stock.  Additionally, while the price of Inogen stock was artificially inflated, and while Huggenberger was in possession of material, adverse nonpublic information, he sold 120,106 shares of his personally-held Company stock, for which he received $19,763,206.  His insider sales, which were made before certain of the Company's

material misstatements and omissions were exposed, establish, in part, his motive in facilitating and participating in the scheme to cheat the Company and its stockholders.  In 2017 and 2018, Inogen paid Huggenberger total compensation of $448,836 and $223,738, respectively.

20.     Defendant Benjamin M. Anderson-Ray has served as a director of the Company since 2013 and as a member of the Board's Audit Committee since 2013.  Anderson-Ray knowingly, recklessly, and/or with gross negligence made (or caused to be made) improper statements in Inogen's press releases, public filings, and other public statements about Inogen's business metrics, growth opportunities, and the adequacy of its internal controls.  Anderson-Ray also violated section 14(a) of the Exchange Act by negligently making misleading statements in the Company's 2018 and 2019 Proxy Statements.  According to the 2019 Proxy Statement, as of March 15, 2019, Anderson-Ray beneficially owned 31,505 shares of the Company's common stock or approximately $3 million in Company stock.  Additionally, while the price of Inogen stock was artificially inflated, and while Anderson-Ray was in possession of material, adverse nonpublic information, he sold 4,000 shares of his personally-held Company stock, for which he received $689,980.  His insider sales, which were made before certain of the Company's material misstatements and omissions were exposed, establish, in part, his motive in facilitating and participating in the scheme to cheat the Company and its stockholders.  In 2017 and 2018, Inogen paid Anderson-Ray total compensation of $329,030 and $233,238, respectively.

21.     Defendant Scott A. Beardsley has served as a director of the Company and as a member of the CN&G Committee since January 2017.  Beardsley knowingly, recklessly, and/or with gross negligence made (or caused to be made) improper statements in Inogen's press releases, public filings, and other public statements about Inogen's business metrics, growth opportunities, and the adequacy of its internal controls.  Beardsley also violated section 14(a) of the Exchange

Act by negligently making misleading statements in the Company's 2018 and 2019 Proxy Statements. Inogen does not pay any compensation to Beardsley because he has expressly "waive[d] any right to compensation for [his] service on the Board or any committee thereof." However, Beardsley is also a Managing Partner of Novo Ventures (US), a consulting company and subsidiary of Novo Holdings A/S ("Novo"). Beardsley purportedly "is not deemed to be a beneficial owner of, nor does he have a reportable pecuniary interest in, the shares held by Novo Holdings A/S." According to the 2019 Proxy Statement, as of March 15, 2019, Novo beneficially owned more shares of Inogen than any other company or individual, with 3,549,320 shares or 16.19% of the Company's total outstanding shares.

22.     Defendant Loren L. McFarland has served as a director of the Company and as a member of the Audit Committee since 2013. McFarland knowingly, recklessly, and/or with gross negligence made (or caused to be made) improper statements in Inogen's press releases, public filings, and other public statements about Inogen's business metrics, growth opportunities, and the adequacy of its internal controls. McFarland also violated section 14(a) of the Exchange Act by negligently making misleading statements in the Company's 2018 and 2019 Proxy Statements. According to the 2019 Proxy Statement, as of March 15, 2019, McFarland beneficially owned 46,403 shares of the Company's common stock or approximately $4.4 million in Company stock. Additionally, while the price of Inogen stock was artificially inflated, and while McFarland was in possession of material, adverse nonpublic information, he sold 8,125 shares of his personally-held Company stock, for which he received $1,390,889. His insider sales, which were made before certain of the Company's material misstatements and omissions were exposed, establish, in part, his motive in facilitating and participating in the scheme to cheat the Company and its

stockholders.  In 2017 and 2018, Inogen paid McFarland total compensation of $387,850 and $236,238, respectively.

23.     Defendant Heather D. Rider has served as a director of the Company since August 2014, as a member of the CN&G Committee since August 2014, and as its Chair since January 2018.  Rider knowingly, recklessly, and/or with gross negligence made (or caused to be made) improper statements in Inogen's press releases, public filings, and other public statements about Inogen's business metrics, growth opportunities, and the adequacy of its internal controls. Rider also violated section 14(a) of the Exchange Act by negligently making misleading statements in the Company's 2018 and 2019 Proxy Statements.  According to the 2019 Proxy Statement, as of March 15, 2019, Rider beneficially owned 26,489 shares of the Company's common stock or approximately $2.5 million in Company stock.  Additionally, while the price of Inogen stock was artificially inflated, and while Rider was in possession of material, adverse nonpublic information, she sold 9,722 shares of her personally-held Company stock, for which she received $1,696,905. Her insider sales, which were made before certain of the Company's material misstatements and omissions were exposed, establish, in part, her motive in facilitating and participating in the scheme to cheat the Company and its stockholders.  In 2017 and 2018, Inogen paid Rider total compensation of $327,030 and $240,238, respectively.

24.     Defendant R. Scott Greer has served as a director of the Company since August 2015 and as Chair of the Audit Committee since January 1, 2018.  The Board considers Greer the "audit committee financial expert" as described in applicable rules and regulations of the SEC.  Greer knowingly, recklessly, and/or with gross negligence made (or caused to be made) improper statements in Inogen's press releases, public filings, and other public statements about Inogen's business metrics, growth opportunities, and the adequacy of its internal controls.  Greer

also violated section 14(a) of the Exchange Act by negligently making misleading statements in the Company's 2018 and 2019 Proxy Statements. According to the 2019 Proxy Statement, as of March 15, 2019, Greer beneficially owned 60,692 shares of the Company's common stock or approximately $5.8 million in Company stock. In 2017 and 2018, Inogen paid Greer total compensation of $329,030 and $240,738, respectively.

25. Defendants Wilkinson, Lukatch, Huggenberger, Anderson-Ray, Beardsley, McFarland, Rider, and Greer are collectively referred to as the "Director Defendants." Defendants Anderson-Ray, McFarland, and Greer are collectively referred to as the "Audit Committee Defendants." Defendants Lukatch, Beardsley, and Rider are collectively referred to as the "CN&G Committee Defendants." Defendants Wilkinson and Bauerlein are collectively referred to as the "Securities Class Action Defendants." Defendants Wilkinson, Bauerlein, Lukatch, Huggenberger, Anderson-Ray, McFarland, and Rider are collectively referred to as the "Insider Selling Defendants." All of the foregoing individuals are sometimes collectively referred to herein as the "Individual Defendants."

## IV.   DEFENDANTS' DUTIES

### A.   The Individual Defendants' Fiduciary Duties

26. By virtue of their positions as officers and/or directors of Inogen and because of their responsibility and obligation to control the business and corporate affairs of the Company, the Individual Defendants owed, and continue to owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner. Each Individual Defendant owed, and continues to owe, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the

affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of their personal interest or benefit.

27.     Because of their positions of control and authority as officers and/or directors of Inogen, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and/or directorial positions with Inogen, each of the Individual Defendants had knowledge of material nonpublic information about the Company.  In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had and continue to have a duty to promptly disseminate accurate and truthful information regarding the Company's business, operations, and prospects so as to ensure the market price of the Company's stock is based on truthful and accurate information.

28.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Inogen and was acting within the course and scope of such agency.

29.     To discharge their duties, the Individual Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Inogen.  By virtue of such duties, the Individual Defendants were, and are, required to, among other things:

> a.     exercise good faith to ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's certificate of incorporation and bylaws);
>
> b.     neither violate nor knowingly permit any officer, director, or employee of Inogen to violate any applicable laws, rules, or regulations;
>
> c.     remain informed as to the status of Inogen's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a

reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

d.   establish and maintain systematic and accurate records and reports of the business and affairs of Inogen and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e.   maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Inogen are conducted in accordance with all applicable laws, rules, and regulations; and

f.   truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

**B.   Duties Pursuant to the Company's Code of Ethics and Conduct**

30.   The Individual Defendants are also bound by the Company's Code of Ethics and Conduct (the "Code of Ethics"), which applies to all Inogen directors and employees (including officers). Every director and employee must sign an acknowledgment indicating that he or she has read and understands the Code of Ethics.

31.   Under the section entitled "Highlights of Our Code of Ethics," the Code of Ethics states in relevant part: "[w]e conduct our business professionally and ethically and set up mechanisms to prevent fraud," and "[w]e use all reasonable efforts to ensure that all public disclosures, such as financial statements and reports, are full, fair, accurate, timely, and complete."

32.   Under the section entitled "Standards of Conduct," the Code of Ethics states in part: "Inogen expects all employees and directors to act with the highest standards of honesty and ethical conduct. Inogen considers honest conduct to be conduct that is free from fraud or deception and is characterized by truthfulness. I nogen considers ethical conduct to be conduct conforming to accepted professional standards of conduct and government regulations and laws."

33.   According to the Code of Ethics, the Company's Executive Management serves on the Ethics Committee, and the Director of Regulatory Affairs and Compliance serves as the "Ethics

Coordinator." Further, "[t]he Ethics Coordinator reports to Executive Management any findings, concerns, or suggestions for improvement following Ethics Committee meetings or as situations arise." Additionally, "[t]he Ethics Committee will make periodic reports to Inogen's Audit Committee regarding the implementation and effectiveness of this Code as well as the policies and procedures put in place to ensure compliance with the Code."

34. Under the section entitled "General Principles Applicable to Employees," the Code of Ethics states in part: "Each employee having any responsibility for, or involvement in, financial reporting or accounting must have an appropriate understanding of relevant accounting and financial reporting principles, standards, laws, rules, and regulations as well as Inogen's financial and accounting policies, controls and procedures."

35. Under the section entitled "Public Communications and Reports," the Code of Ethics states in part:

> Inogen files reports and other documents with the Securities and Exchange Commission, the NASDAQ Global Market, tax authorities, and other governmental and regulatory agencies. In addition, from time to time, Inogen makes other public announcements, such as issuing press releases.
>
> Employees involved in the preparation of these reports, documents, or announcements are expected to use all reasonable care and efforts to ensure that Inogen's disclosures and presentations are fair, complete, accurate, objective, relevant, timely and understandable. In addition, employees are expected to comply with Inogen's disclosure controls and procedures, which are designed to ensure full, fair, accurate, timely and understandable disclosure in our public reports and communications.

36. Under the section entitled "Compliance with Laws, Rules and Regulations," the Code of Ethics states in part:

> Employees and directors must comply with all laws, rules, and regulations applicable to Inogen and its business, as well as applicable Inogen policies and procedures.

*     *     *

Of particular importance is compliance with United States securities laws. Inogen has adopted an Insider Trading Compliance Program to help ensure compliance with these laws. Violations of those policies will be treated as violations of this Code.

37. Under the section entitled "Insider Trading," the Code of Ethics states in part:

The purpose of Inogen's insider trading policy is to establish guidelines to ensure that all employees and directors comply with laws prohibiting insider trading. No employee or director in possession of material, non-public information may trade Inogen's securities (or advise others to trade) from the time they obtain such information until after adequate public disclosure of the information has been made. Those subject to this Code who knowingly trade Inogen securities while in possession of material, non-public information or who tip information to others may be subject to appropriate disciplinary and/or enforcement action, which may include termination of employment, consistent with applicable laws. Insider trading is also a crime.

38. Under a section entitled "Disclosure," the Code of Ethics states in part:

The information in Inogen's public communications, including filings with the Securities and Exchange Commission, must be full, fair, accurate, timely, and understandable. All employees and directors are responsible for acting in furtherance of this policy. In particular, each employee and director is responsible for complying with Inogen's disclosure controls and procedures and internal controls for financial reporting.

39. Under a section entitled "Fair Dealing," the Code of Ethics states in part:

Inogen seeks to excel while operating fairly and honestly, never through unethical or illegal business practices. Each employee and director should endeavor to deal fairly with Inogen's customers . . . . No employee or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing practices.

40. Upon information and belief, the Company maintained a Code of Ethics during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the Individual Defendants as those set forth above.

### C.    Duties Pursuant to the Audit Committee's Charter

41.    In addition to the duties discussed above, the Audit Committee Defendants owed specific duties to Inogen under the Audit Committee's Charter (the "Audit Charter").  According to the Audit Charter, the Audit Committee's purpose is to:

- provide oversight of all material aspects of the Company's accounting and financial reporting processes and the audit of the Company's financial statements;

- assist the Board in monitoring (i) the integrity of the Company's financial statements, (ii) the Company's internal accounting and financial controls, (iii) the Company's compliance with legal and regulatory requirements, (iv) the organization and performance of the Company's internal audit function . . . ;

- provide the Board with the results of the Audit Committee's monitoring and recommendations derived therefrom;

42.    The Audit Charter charges the Audit Committee Defendants with the following duties and responsibilities, among others:

6.  The Audit Committee shall discuss and, as appropriate, review with management and the independent auditors the Company's annual and quarterly financial statements and annual and quarterly reports on Forms 10-K and 10-Q, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," . . .

7.  The Audit Committee shall discuss with management and the independent auditors significant financial reporting issues raised and judgments made in connection with the preparation of the Company's financial statements, including the review of (i) major issues regarding accounting principles and financial statement presentation, . . . and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; . . . (iv) the type and presentation of information to be included in earnings press releases, as well as any financial information and earnings guidance to be provided to analysts and rating agencies.

*       *       *

10.  The Audit Committee shall discuss with management and the independent auditors any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

*       *       *

12.   The Audit Committee shall discuss, in a general manner, earnings press releases and financial information and earnings guidance to be provided to analysts and rating agencies . . . .

\*        \*        \*

16.   The Audit Committee shall review the adequacy and effectiveness of the Company's internal control policies and procedures on a regular basis, including the responsibilities, budget and staffing of the Company's audit function, as well as any special audit steps adopted in light of material control deficiencies, through inquiry and discussions with the Company's independent auditors and management.  In addition, the Audit Committee shall review the reports prepared by management, and attested to by the Company's independent auditors, assessing the adequacy and effectiveness of the Company's internal controls and procedures, prior to the inclusion of such reports in the Company's periodic filings as required under SEC rules.  The Audit Committee shall review disclosures regarding the Company's internal controls that are required to be included in SEC reports.

\*        \*        \*

20.   The Audit Committee shall monitor compliance with the portions of the Company's code of ethics applicable to its senior financial officers.

\*        \*        \*

24.   The Audit Committee shall make regular reports to the Board, which reports shall include any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, or the performance and independence of the Company's independent auditors.

43.   Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

## V.   BREACHES OF DUTIES

44.   The conduct of the Individual Defendants described herein involves a knowing and culpable violation of their obligations as officers and directors of Inogen, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to the Company.

45.     The Individual Defendants breached their duty of loyalty and good faith by allowing each other to cause, or by themselves causing, the Company to make improper statements in Inogen's press releases, public filings, and other public statements relating to the Company's business, financial prospects, and internal controls.  The Individual Defendants knew, or were reckless in not knowing, the Undisclosed Facts and that they were making improper statements.

46.     The Individual Defendants also breached their fiduciary duties by failing to ensure that the Company had effective internal controls over its public disclosures and over its sales processes so as to prevent (and not encourage) the abusive sales tactics employed by its sales representatives and distributors.  Notably, the Board was already on notice of internal control problems with respect to the Company's direct-to-consumer sales representatives.  In 2015, an internal probe of Inogen's sales staff resulted in a delayed filing of its financial reports with the SEC and uncovered that five of its direct-to-consumer sales representatives falsified or improperly modified sales and rental documentation, resulting in a $300,000 revenue hit and a $100,000 reduction in net income.

47.     The Insider Selling Defendants further breached their duty of loyalty and good faith by selling their personal holdings of Inogen common stock while in possession of material, adverse nonpublic information.

48.     The Individual Defendants had a duty to properly oversee compliance with Inogen's Code of Ethics.  The Code of Ethics, which applies to all directors, officers, and employees, requires that all public disclosures be full, fair, complete, accurate, objective, relevant, timely, and understandable.  It also requires that (i) employees and directors comply with all laws, rules, and regulations applicable to Inogen and its business, as well as applicable Inogen policies and procedures and (ii) no employee or director in possession of material nonpublic information

trade Inogen's securities from the time he or she obtains such information until after adequate public disclosure of the information has been made.  The Individual Defendants breached their duties by failing to comply with, and failing to oversee and require others to comply with, the Code of Ethics.

49.     The Audit Committee members had a duty to properly oversee Inogen's compliance with legal and regulatory requirements, including public disclosure controls and procedure, as well as its internal control functions and disclosures.  As described herein, the Audit Committee Defendants breached their duty of loyalty and good faith by (i) approving or otherwise allowing the improper statements, (ii) failing to properly oversee Inogen's compliance with legal and regulatory requirements, and (iii) failing to oversee and implement effective public disclosure and sales controls and procedures.

50.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Inogen, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such improper actions.

## VI.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Inogen, regarding the Company's financial metrics, future

prospects, and the Individual Defendants' management of and oversight over Inogen's operations; (ii) enhance the Individual Defendants' executive and directorial positions at Inogen and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (iii) allow the Individual Defendants to unlawfully sell their personally-held Inogen shares at artificially inflated prices so as to realize more than $43 million in proceeds.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

53.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper public statements and allowed the Company to maintain ineffective internal controls, polices, and procedures.

54.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and to conceal adverse information concerning the Company's operations, future prospects, and controls.

55.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements and maintain inadequate controls.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct.

56.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs described herein.  In taking such actions to substantially assist the commission of the wrongdoing, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VII.    SUBSTANTIVE ALLEGATIONS

### A.    Company Background

57.     Inogen is a medical technology company that develops, manufactures, and markets POCs used to deliver supplemental LTOT to patients suffering from chronic respiratory conditions.  Traditionally, such patients have relied on stationary oxygen concentrator systems for use in the home and oxygen tanks or cylinders for mobile use.  The tanks and cylinders must be delivered regularly and have a finite amount of oxygen.  Patients must attach long, cumbersome tubing to their stationary concentrators to enable mobility within their homes.  The Company's proprietary Inogen One® systems, on the other hand, concentrate the air around the patient to offer a single source of supplemental oxygen anytime, anywhere with a portable device weighing as little as 2.8 pounds.

58.     Inogen's reported revenues have grown dramatically over the past several years. With Inogen's rapid growth, a key concern for investors has been whether such growth would be sustainable.  A key metric to understanding the sustainability of Inogen's rapid growth is its TAM, which represents the number of people with respiratory illness that could benefit from using a POC.  Not all patients on LTOT are potential customers because POCs are inappropriate for non-ambulatory patients, or for those who require the continuous flow of oxygen, rather than the pulse flow provided by a POC.  The growth rate of the TAM is also relevant to the potential sales growth

for Inogen.  Finally, the market penetration of POCs replacing traditional oxygen therapy informs investors of the market saturation.  Lower penetration means there is more room for sales growth.

59.      The Company reports its financial results in three business segments: (i) direct-to-consumer; (ii) domestic business-to-business; and (iii) international.

60.      DTC and B2B sales account for the bulk of Inogen's revenues.  For example, U.S. revenues for 2018 consisted of approximately 50% DTC sales: 42% to traditional HME providers, distributors and resellers, and 8% to direct-to-consumer rentals.  The DTC results are divided between cash sales to customers, in which the customer pays the retail price for the POC out-of-pocket, and rentals, in which the customer rents the device from Inogen, and Inogen bills Medicare or private insurance for a monthly reimbursement.

61.      While the retail price is set by Inogen (approximately $2,400 for purchase or $70/month for rental), Medicare sets the monthly reimbursement rate, which allows Medicare to aggressively control costs.  For example, in 2016, Medicare reimbursed the cost of a POC rental at a range of $46.69 to $49.52 per month, but that rate had dropped to $36.14 from $41.91 per month in 2017.

62.      POC rentals are generally for a term of five years.  Medicare pays for 36 months of oxygen treatment, at which point reimbursements are "capped" and unreimbursed for the next 24 months of treatment.  That is, the patient pays no more rental fees during this period, but the supplier retains ownership of the equipment.  Thus, it is not cost effective to provide a new device to Medicare patients to rent when the patient has already exhausted many of the 36 available monthly payments.  This effectively eliminates patients who have received a substantial number of their 36 months of reimbursement from the rental market for at least the 2 capped years, if not longer.

63.     Inogen is an accredited Medicare DME/HME provider and is licensed to sell directly to Medicare customers in all 50 states and the District of Columbia.  As stated in the Company's 2017 and 2018 10-Ks, these licenses are critical to Inogen because penalties associated with failing to comply with Medicare regulations would have a materially adverse effect on Inogen's business.

64.     The domestic B2B segment involves sales of POCs to HME providers who then sell or rent the POCs to patients.  B2B sales are divided between Inogen's own private label HME and other competing HMEs.  HMEs typically buy the POCs from Inogen at negotiated rates below retail price and rent or sell the units to their customers.

65.     Due to the ability of Medicare and HME providers to demand lower prices from Inogen, DTC sales at retail prices generate higher margins.  Those higher margins, however, are tempered by the added cost of hiring sales representatives (and the associated marketing efforts).  However, so long as there is sufficient demand for the out-of-pocket cash sales, these sales and marketing spends may be justified.

**B.      The Individual Defendants Breached Their Fiduciary Duties by Allowing the Company to Make a Series of Improper Statements to the Public**

66.     As detailed below, the Individual Defendants caused Inogen to make materially false and misleading statements concerning the Company's business operations, financial health, growth prospects, and the adequacy of its internal controls in its SEC filings, press releases, analysts calls, investor presentations, and through other public statements during the Relevant Period.

***November 2017 False and Misleading Statements***

67.     On November 7, 2017, the Individual Defendants caused Inogen to issue a press release announcing its 3Q17 financial results for the period ended September 30, 2017, and fiscal

2017 and 2018 financial guidance.  In addition to announcing "[r]ecord total revenue of $69.0 million, up 26.8% over the same period in 2016," Inogen increased its 4Q17 revenue guidance to a "range [of] $244 to $248 million, which represents year-over-year growth of 20.3% to 22.3%, and compares to previous guidance of $239 to $243 million."  The Company "maintain[ed] its guidance range for full year 2017 net income of $25 to $27 million, which represents 21.8% to 31.6% year-over-year growth," and "increas[ed] its guidance range for full year 2017 Adjusted EBITDA to $49 to $51 million, which represents year-over-year growth of 12.9% to 17.5%, and compares to previous guidance of $48 to $50 million."  For 2018, Inogen "provid[ed] a guidance range for full year 2018 total revenue of $295 to $305 million, representing 19.9% to 24.0% growth over the 2017 guidance mid-point of $246 million."  Inogen also "provid[ed] a full year 2018 net income estimate of $31 to $35 million, representing 19.2% to 34.6% growth over the 2017 guidance mid-point of $26 million," and "Adjusted EBITDA of $60 to $64 million, representing 20.0% to 28.0% growth over the 2017 guidance mid-point of $50 million."

68.    Justifying the increase in Inogen's FY17 and FY18 financial guidance, the press release quoted defendant Wilkinson as crediting the increase to the strong and growing market for POCs and the Company's DTC salesforce acumen, stating in pertinent part:

> The third quarter of 2017 was a record revenue quarter for us, ***driven by increased sales in our domestic business-to-business and direct-to-consumer channels*** . . . . We are executing on our strategic initiatives and remain focused on increasing adoption of our best-in-class oxygen product offerings across all of our channels. ***We believe we should see strong results in 2018 as portable oxygen concentrators continue to be adopted worldwide*** . . . .[1]

69.    Inogen's 3Q17 press release also disclosed a shift away from the less profitable rental market on account of the strong DTC results and prospects.  The press release stated that

---

[1] In this section VII.B and in section VIII, below, all emphasis is added unless otherwise noted.

"Inogen expects rental revenue to decline in 2017 compared to 2016 by approximately 32% based on lower average rental revenue per patient and *a focus on sales versus rentals.*"

70.     With respect to Inogen's increased 2017 full year guidance, the press release focused on the Company's strong sales growth, stating: "***The Company expects direct-to-consumer sales and domestic business-to-business sales to be our strongest growing channels and to have similar growth rates*** . . . ."

71.     Also, on November 7, 2017, the Individual Defendants caused Inogen to host a conference call with analysts and investors to discuss the Company's 3Q17 financial results. During the call, defendant Wilkinson stated in pertinent part:

> We continued to steadily invest in direct-to-consumer sales force additions in the United States.  We also worked to optimize our new customer relationship management, or CRM system, and I'm pleased that *we have delivered such strong sales and solid bottom line results* during the third quarter while we were still investing in training and productivity improvements in the system.

72.     Concerning the Company's large and purportedly growing TAM, Wilkinson stated in pertinent part: "Looking at 2018, we expect to remain a high-growth company, as portable oxygen concentrators are still in the early stages of adoption worldwide and our sales force continues to grow."

73.     Defendant Wilkinson conveyed that Inogen's "strategy is to hire additional sales employees in the fourth quarter of 2017 and throughout 2018 and invest in marketing activities to increase consumer awareness as we believe this is still our most effective means to drive growth of direct-to-consumer sales."

74.     In addition, Defendant Bauerlein stated that the Company was "continuing to invest in our new Cleveland area facility, European facility and our CRM system while also continuing to ramp our direct-to-consumer sales reps and the related media investments, which we expect will contribute to 2018 revenue growth."

75.     Reiterating what had previously been discussed in the press release, defendant Bauerlein stated that the Company would continue to focus on sales rather than rentals:

> We expect direct-to-consumer sales to be our fastest-growing channel, domestic business-to-business sales to have a significant growth rate and international business-to-business sales to have a modest growth rate where the strategy will still be focused on the European market.  We expect rental revenue to be relatively flat, meaning plus or minus 5%, in 2018 compared to 2017 due to our continued focus on sales versus rental.

76.     The Company also highlighted its strengths in the DTC market.  For example, defendant Bauerlein boasted that "*our reps have become more productive,* and that's in spite of the headwinds that we saw on the CRM implementation."  She further explained:

> We've been able to continue to add to our Cleveland site as well.  And while you know that those sales reps take 4 to 6 months to come up to productivity, we are starting to see the contributions from the people we have hired in the first half of the year, and we expect the people that we hired in the second half of the year to really contribute more materially going into 2018.  And *that's really why we still expect in 2018 direct-to-consumer sales to be the fastest-growing channel in our business because we are continuing to invest there*.  And that's why we really expect that to continue to be the key driver to our sales growth.

77.     In response to an analyst's request for more information on the sales representatives' productivity and the timing of contributions by the newly hired sales representatives, defendant Bauerlein confirmed that Inogen would ramp up its new sales hires quickly, stating:

> Now on the rep side, they still take about 4 to 6 months to come up to productivity, but they start contributing in the first couple of months.  So they certainly start making some sales and then ramp to that full productivity in months 4 through 6.  *So it's a relatively quick turn from when a rep is hired to when they start producing.*

78.     The Company also expressed confidence in the growth of Inogen's B2B sales.  On the same conference call, defendant Wilkinson stated:

> We are very pleased with our domestic business-to-business sales in the third quarter of 2017, which increased 41.7% over the third quarter of 2016, exceeding our expectations.

Growth in this channel was primarily driven by purchases from traditional home medical equipment providers and strong private label demand.  Revenue from our private label partner and traditional HME providers combined represented more than half of the domestic business-to-business channel's total sales revenue in the third quarter of 2017.

79.     To justify his optimism to investors, defendant Wilkinson claimed that this data likely overstated Inogen's POC penetration to date into the LTOT market:

[W]e estimate that the share of portable oxygen concentrators in Medicare oxygen therapy grew from 8.0% in 2015 to 9.1% in 2016.

However, this estimate does not include patient cash sales or private insurance transactions.  Our direct-to-consumer cash sales in 2016 grew significantly faster than rentals.  ***So we believe that this data from CMS may represent a conservative estimate of actual portable oxygen concentrator market penetration***.

That said, POCs were still the fastest-growing modality in oxygen therapy based on the CMS data and still have a significant growth opportunity before reaching full market saturation.

80.     The slides that the Individual Defendants presented in connection with Inogen's 3Q17 financial results contained misleading TAM and TAM growth figures for the Company.  One slide represented that the U.S. Market for POCs was experiencing "7-10% growth per year" and would grow from 3 million patients in 2015 to 4 million patients in 2019  The same slide also conveyed to investors that the market was actually much larger than these estimates, stating that "an estimated 50% of COPD patients are currently undiagnosed," as shown below.



81.     Also, on November 7, 2017, the Individual Defendants caused Inogen to file its

quarterly financial report with the SEC on Form 10-Q, which stated in pertinent part:

> Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016. ***The Company estimates based on 2016 Medicare data that patients using portable oxygen concentrators represent approximately 9.1% of the total addressable oxygen market in the United States***, although the Medicare data does not account for private insurance and cash-pay sales into the market.  Based on 2016 industry data, the Company believes it was the leading worldwide manufacturer of portable oxygen concentrators.   The Company believes it is the only manufacturer of portable oxygen concentrators that employs a direct-to-consumer strategy in the United States, meaning the Company markets its products to patients, processes their physician paperwork, provides clinical support as needed and bills Medicare or insurance on their behalf.  To pursue a direct-to-consumer strategy, the Company's manufacturing competitors would need to meet national accreditation and state-by-state licensing requirements and secure Medicare billing privileges, including Medicare competitive bidding contracts, as well as compete with the home medical equipment providers who many of the Company's manufacturing competitors sell to across their entire homecare business.

Since adopting the Company's direct-to-consumer strategy in 2009 following its acquisition of Comfort Life Medical Supply, LLC, which had an active Medicare billing number but few other assets and limited business activities, the Company has directly sold or rented more than 327,000 of its Inogen oxygen concentrators as of September 30, 2017.

82.     Inogen's 3Q17 10-Q was also accompanied by certifications signed by Wilkinson and Bauerlein pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications").  These false and misleading SOX Certifications stated as follows:

1. I have reviewed this Quarterly Report on Form 10-Q of Inogen, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent

fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

83.     The statements set forth above that were premised on the size of Inogen's TAM were materially false and/or misleading at the time they were made because: (a) the annual Medicare data relied on by the Company overstated the number of current oxygen therapy patients by assuming that each individual patient used a separate device when, in reality, sometimes multiple patients used the same device during a given year (*e.g.,* if a patient died, given the POC's seven-to-eight year service life, the same POC would be repurposed for another patient, which Medicare considered a second patient in its records); and (b) the Company's inference of approximately 15 million additional undiagnosed COPD patients from the approximately 15 million Americans already diagnosed with COPD was based on an outdated 1988-1994 Centers for Disease Control and Prevention ("CDC") survey which merely stated approximately 50% of patients did not know they had COPD at the time they were diagnosed.

84.     The statements set forth above that were premised on the growth rate of the TAM were materially false and/or misleading because both the Medicare data and the Kaiser Family Foundation data for Medicare Advantage, relied upon by the Company, reported negative annual growth rates.

85.     The statements above that were premised on (i) the low market penetration of POCs and (ii) Inogen's ability to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory LTOT patients were materially false and/or misleading at the time they were made because: (a) Inogen's POCs are nonproprietary and sell at a premium price, and are thus subject to price and quality competition from similar POCs made by other manufacturers; (b) industry consensus is that POCs are inappropriate for up to 50% of ambulatory patients, such as those who only need oxygen therapy for sleep, and are thus highly unlikely to obtain a POC; (c) some patients with more advanced respiratory disease require a stronger continuous oxygen stream that Inogen's pulse stream POCs cannot provide; (d) the Company's conscious decision to abandon the rental market would leave Inogen unable to service the larger and more stable Medicare and insurance rental reimbursement market; (e) POC rentals were heavily constrained by low Medicare reimbursement schedules, rendering Inogen POC rentals increasingly less profitable or, in the alternative, less desirable products for patients to rent on a partial cost reimbursement basis; and (f) because Medicare capped reimbursement after three years into the five-year rental term, Inogen could only profitably rent to patients early into the reimbursement period, effectively eliminating as potential customers far more than just the 18% of patients in years four and five of their rentals.

86.     The statements set forth above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales were materially false and/or misleading at the time they were made because: (a) despite ambulatory patients' preferences for a POC, the market was limited to those who had thousands of dollars on hand to purchase the POC and could not wait for Medicare or private insurance to process their claim; (b) the growth of out-of-pocket cash sales was due in large part to skewed incentives that created a toxic boiler-room

sales environment in which nefarious sales tactics, in violation of Medicare policy, were employed to deceive Inogen's elderly customer base into buying and paying for POCs out-of-pocket; (c) there was a material risk that Inogen's ability to continue to cajole POC patients into paying cash out-of-pocket via deceptive sales practices would be substantially constrained by CMS revoking Inogen's Medicare accreditation for deceiving customers; and (d) Inogen's newly-hired sales representatives in 2018 were not of the same quality as the earlier hires because the applicant pool had virtually been exhausted.

87.     The statements set forth above that were premised on Inogen's ability to grow its B2B sales of POCs to HMEs were materially false and/or misleading at the time they were made because: (a) Inogen's top HME partner was run by a convicted felon employing the same or worse sales abuses as Inogen's in-house sales team; (b) HMEs faced price constraints from their customers and insurance reimbursement schedules, would service multiple would-be DTC customers over the lifespan of a single POC, and were purchasing more POCs than they could reasonably deploy; and (c) Inogen's B2B sales and DTC sales were competing for the same customers and would cannibalize business from each other.

88.     The statements set forth above contained in the SOX Certifications were false and misleading when made because the reports contained untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading and because Inogen lacked effective internal controls designed to: (i) prevent misconduct by its growing sales staff and its distributors; (ii) protect the integrity of the public statements made by and behalf of the Company; and (iii) ensure compliance with all applicable laws and regulations.

*__January 2018 False and Misleading Statements__*

89.      On January 9, 2018, the Individual Defendants authorized certain members of Inogen's senior management to attend and present at the J.P. Morgan Healthcare Conference.  At the conference, defendant Bauerlein heralded Inogen's success in selling POCs directly to patients paying cash out-of-pocket, exaggerating the size and unique nature of the market for these sales, despite the existence of Medicare reimbursement:

> Sales have been growing very nicely on the direct-to-consumer side, over 40% in the third quarter.  And now, ***this is really people who are buying retail out-of-pocket, showing the true demand for POCs***, in the fact that patients really have an interest in getting a POC instead of the tank-based systems that they already have.

90.      Bauerlein further misleadingly asserted that hiring talented sales representatives would ensure that Inogen could continue its extraordinary DTC growth.  She stated:

> So as we said, ***we really did want to invest in the sales team because that's our #1 limiter to growth and we were able to execute that.***  Majority of those sales rep additions were in the Cleveland facility, so that started in September and through the end of the year.  So these people are still in the very early stages of coming up the curve of productivity.  They take about 4 to 6 months to come up to productivity. ***And this is the main driver of why we expect, in 2018, to have $300 million in sales at the midpoint of guidance.***  Because we expect direct-to-consumer sales to be the fastest-growing segment because of the investments that we've made in the inside sales team in 2017.  And we expect to continue to expand that team going into 2018.  And that Cleveland area facility, over the next 3 years, we expect to add 240 employees, a mix of sales and service employees.

91.      During the conference, despite expressing the most confidence in Inogen's DTC channel, the Individual Defendants conveyed a heightened optimism in the B2B segment due to the spillover effects from their DTC sales and marketing teams.  Defendant Wilkinson explained:

> As I noted, while our primary go-to-market strategy is to focus on patients, the Medicare competitive bidding cuts have put pressure on the providers, such that delivering tanks is simply unsustainable.  They've looked at Inogen as the leader in the space to help them transition their model from a delivery model to a nondelivery one.  We're the company that has 10 years' experience employing a nondelivery model ourselves.  So we've proven that the model works, we've proven it with our products.  So our value to that provider channel is not only in the best product on the market, with a strong reliability but also in our know-how and how to administer

the nondelivery model. ***You see there we've had great growth results through our direct-to-consumer strategy, but we've also had incredible growth through the business-to-business channel in the United States. So we've reaped the benefits on both side through our direct-to-consumer approach.***

92.     The slides from this conference contained misleading TAM and TAM growth figures for the Company. One slide represented that the U.S. Market for POCs was experiencing "7-10% growth per year" and would grow from 3 million patients in 2015 to 4 million patients in 2019. The same slide also misled investors that the market was much larger than these estimates, stating that "an estimated 50% of COPD patients are currently undiagnosed." The slide is shown below:



93.     The January 2018 statements above that were premised on the size of Inogen's TAM were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 83, above. The statements above that were premised on the growth rate of

Inogen's TAM were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 84, above.  The statements above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 86, above.  The statements above that were premised on Inogen's ability to grow its B2B sales of POCs to HMEs were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 87, above.

### *February 2018 False and Misleading Statements*

94.     On February 27, 2018, after the close of trading, the Individual Defendants caused to Inogen to issue a press release announcing its FY17 financial results for the year ended December 31, 2017.   In addition to emphasizing that the Company's "[t]otal revenue of $63.8 million" for FY17 was "up 25.4% over the same period in 2016," the Individual Defendants again increased Inogen's FY18 financial guidance, providing a "revenue guidance range [of] $298 to $308 million, up from $295 to $305 million, representing growth of 19.5% to 23.5% versus 2017 full year results."  It further stated that it "*expect[ed] direct-to-consumer sales to be its fastest growing channel, domestic business-to-business sales to have a solid growth rate*, and" for "*rental revenue to be relatively flat in 2018 compared to 2017 as the Company continues to focus on sales versus rentals*."   The Individual Defendants also "increas[ed] [Inogen's] full year 2018 GAAP net income and non-GAAP net income guidance range to $36 to $39 million, up from $31 to $35 million, representing growth of 71.4% to 85.7% compared to 2017 GAAP net income of $21.0 million and growth of 26.0% to 36.5% compared to 2017 non-GAAP net income of $28.6 million," while "maintaining its guidance range for full year 2018 Adjusted EBITDA of $60 to $64 million, representing 18.0% to 25.9% growth compared to 2017 results."

95.     Justifying the increase in Inogen's FY18 financial guidance, the press release quoted Wilkinson crediting the strong and growing market for portable oxygen and the Company's strong direct-to-customer salesforce acumen, stating in pertinent part as follows:

> The fourth quarter of 2017 was another successful quarter for us, ***driven by record sales in our domestic direct-to-consumer channel*** and strong sales in our domestic business-to-business channel . . . .  We are executing on our strategic initiatives and remain focused on increasing adoption of our best-in-class oxygen product offerings across all of our sales channels.  We believe we should see strong sales growth in 2018 as portable oxygen concentrator penetration increases worldwide.

96.     On February 27, 2018, the Individual Defendants also hosted a conference call with analysts and investors to discuss the Company's financial results.  During the call, defendant Wilkinson created the misleading impression that Inogen's record sales growth would continue simply by increasing the number of the "talented" sales representatives hired in Cleveland and investing in customer awareness:

> Our record direct-to-consumer sales of $24.5 million in the fourth quarter of 2017 exceeded our expectations, as we steadily added new inside sales representatives, with most located in our new Cleveland facility.  Our direct-to-consumer sales team consisted of 263 inside sales reps as of December 31, 2017, which represented an increase of 86 reps over our 2016 year-end total of 177.

> Our strategy is to steadily hire additional sales representatives throughout 2018 and continue to invest in marketing activities to increase consumer awareness as ***we believe this is still our most effective means to drive growth of direct-to-consumer sales.***

97.     Defendant Bauerlein also misleadingly attributed the sales growth to additional sales representatives and their sales acumen, stating that "[d]irect-to-consumer sales for the fourth quarter of 2017 were a record $24.5 million, representing 57.5% growth over the fourth quarter of 2016, primarily due to increased sales representative headcount, increased marketing expenditures and increased productivity."

98.     During the conference call, an analyst posed the question: "what the historical correlation has been from adding new sales reps and how that translates into sales growth going

forward and what that might mean in terms of growth rates in '18 in the DTC channel?" In response, Bauerlein confirmed the misleading implication that adding sales representatives would result in a proportionate increase in sales, stating:

> **So it has closely correlated with, over time, the sales growth in that direct-to-consumer sales channel.** So we would expect that as we've added this additional sales capacity outside of that first 4- to 6-month investment that you have for new hires, that **you will see that growth on the direct-to-consumer side associated with us increasing that sales capacity. Because as you know, our limit to growth in creating additional consumer awareness is really tied to how much sales capacity we have.** So as we add that additional sales capacity, we spend more in marketing to drive more leads to fill that sales capacity. And that's our plan going forward as well. **And we do plan to continue to add reps going into 2018 as well as we still think we're a long way from full saturation on the direct-to-consumer sales side of the business.**

99.     When asked about his 10% to 12% market penetration figures, defendant Wilkinson expressed to investors the same faux confidence that the simple process of adding sales representatives and marketing funds would be effective in increasing Inogen's DTC sales because it's "relatively easy to sell somebody a unit if they have the money, because it's hard to put a price on freedom" and that the "opportunity today is still using our sales team to convert oxygen patients, so that's what we're focused on."

100.     Defendant Wilkinson also explained to investors the simplicity of the Company's sales strategy:

> [W]e don't assign territories to the inside reps. We've got leads coming in every day from all over the USA, and they are distributed more or less evenly across the sales force. So the way we manage the sales team is every rep is going to get x number of new leads every month. By not assigning territories, it's made it really easy for us to scale, because if you think about it, if we did have more territories, then you've got to rebalance and recut your sales territories really almost every month the way we've scaled the sales team.

101.     That same day, the Individual Defendants caused Inogen to file its 2017 Annual Report for the fiscal year ended December 31, 2017 with the SEC on Form 10-K. Discussing what was characterized as a strong and growing market for Inogen's POCs, which, according to the

Individual Defendants, lacked any competitive pricing pressure or threats thereof, the Annual Report stated in pertinent part:

> *Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016. We estimate based on 2016 Medicare data that the total number of patients using portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States*, although the Medicare data does not account for private insurance and cash-pay patients in the market. Based on 2016 industry data, we believe we were the leading worldwide manufacturer of portable oxygen concentrators. We believe we are the only manufacturer of portable oxygen concentrators that employs a direct-to-consumer strategy in the United States, meaning we market our products to patients, process their physician paperwork, provide clinical support as needed and bill Medicare or insurance on their behalf. To pursue a direct-to-consumer strategy, our manufacturing competitors would need to meet national accreditation and state-by-state licensing requirements and secure Medicare billing privileges, including Medicare competitive bidding contracts, as well as compete with the home medical equipment providers who many of our manufacturing competitors sell to across their entire homecare businesses.

> \*        \*        \*

> **Our market**

> *We believe the current total addressable oxygen therapy market in the United States is approximately $3 billion to $4 billion*, based on 2016 Medicare data and our estimate of the ratio of the Medicare market to the total market. As of 2016, we estimate that there are 4.5 million patients worldwide who use oxygen therapy, *including 2.5 to 3 million patients in the United States, and more than 60% of oxygen therapy patients in the United States are covered by Medicare. The number of oxygen therapy patients in the United States is projected to grow by approximately 7% to 10% per year between 2017 and 2021*, which we believe is the result of earlier diagnosis of chronic respiratory conditions, demographic trends and longer durations of long-term oxygen therapy.

> \*        \*        \*

> Despite the ability of portable oxygen concentrators to address many of the shortcomings of traditional oxygen therapy, we estimate based on 2016 Medicare data that the total number of patients on portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States, although the Medicare data does not account for private insurance and cash-pay patients in the market.

102.     Inogen's 2017 10-K was also accompanied by substantially the same materially misleading SOX Certifications signed by Wilkinson and Bauerlein that were included in the Company's previous Form 10-Q, as set forth in ¶ 82, *supra*.

103.     The February 2018 statements set forth above that were premised on the size of Inogen's TAM were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 83, above.   The statements above that were premised on the growth rate of Inogen's TAM were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 84, above.   The statements above that were premised on (i) the low market penetration of POCs and (ii) Inogen's ability to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory LTOT patients were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 85, above.   The statements above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 86, above.   The statements above that were premised on Inogen's ability to grow its B2B sales of POCs to HMEs were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 87, above.   The statements in the SOX Certifications were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 88, above.

### *April 2018 False and Misleading Statements*

104.     On April 30, 2018, the Individual Defendants caused Inogen to issue a press release announcing its 1Q18 financial results for the period ended March 31, 2018.   In addition to reporting "record" 1Q18 revenues had grown "50.6% over the same period in 2017" to $79.1 million, and that net income had grown 81.4% during the same time period to $10.8 million, Inogen significantly "increas[ed] its full year 2018 total revenue guidance range to $310 to $320 million,

up from $298 to $308 million, representing growth of 24.3% to 28.3% versus 2017 full year

results." As reported in the press release, Inogen also "increas[ed] its full year 2018 GAAP net

income and non-GAAP net income guidance range to $38 to $41 million, up from $36 to

$39 million, representing growth of 80.9% to 95.2% compared to 2017 GAAP net income of

$21.0 million and growth of 33.0% to 43.5% compared to 2017 non-GAAP net income of

$28.6 million," and the "guidance range for full year 2018 Adjusted EBITDA to $62 to

$67 million, up from $60 to $64 million, representing 22.0% to 31.8% growth compared to 2017

results."

105.    Justifying the increase in Inogen's FY18 financial guidance, the press release

quoted defendant Wilkinson crediting the strong and growing market for POCs and the Company's

DTC salesforce acumen, stating in pertinent part:

> In what is historically a seasonally slower quarter, we were able to generate ***record revenues driven by strong sales in both our domestic direct-to-consumer and domestic business-to-business channels*** . . . . We are executing on our strategic initiatives and remain focused on increasing adoption of our best-in-class oxygen product offerings across all of our sales channels. ***We are currently ahead of schedule to meet our plan of hiring 240 Cleveland-based employees by 2020.*** We believe we should see strong sales growth in 2018 as portable oxygen concentrator penetration increases worldwide.

106.    The Company's 1Q18 press release further touted Inogen's strong sales results and

outlook, stating:

> Total revenue for the three months ended March 31, 2018 rose 50.6% to $79.1 million from $52.5 million in the same period in 2017. ***Direct-to-consumer sales rose 67.8% over the same period in 2017, ahead of expectations primarily due to increased sales representative headcount*** and associated consumer marketing. ***Domestic business-to-business sales exceeded expectations and grew 60.4% over the same period in 2017, primarily driven by continued strong demand*** from the Company's private label partner and traditional home medical equipment providers.

*        *        *

> The Company *continues to expect direct-to-consumer sales to be its fastest growing channel, [and] domestic business-to-business sales to have a solid growth rate* . . . .

107.    During the conference call held later that day with investors and stock analysts, defendant Wilkinson again emphasized that the Company's strong DTC sales were the result of Inogen's strong salesforce acumen, stating in pertinent part:

> Our record direct-to-consumer sales of $28.7 million in the first quarter of 2018 exceeded our expectations, *primarily due to increased sales representative headcount and associated consumer spending.* We're currently ahead of schedule to meet our plan of hiring 240 Cleveland-based employees by 2020, with the majority of those being sales reps. Given our recent success, our strategy is to steadily hire additional sales representatives throughout 2018 and continue to invest in marketing activities to increase consumer awareness as we believe that it's still our most effective means to drive growth of the direct-to-consumer sales.

> In fact, we expect to release a new TV commercial to showcase the benefits of our portable oxygen concentrators in the second quarter. Further, we initiated a direct-to-consumer pricing trial in the second quarter of 2018 to ensure our products are optimally priced. We expect to provide an update on this trial on our next earnings call.

> *First quarter of 2018 domestic business-to-business sales of $28 million was a record for us and exceeded our expectations, primarily due to continued success with our private label partner and traditional home medical equipment providers.*

> *                *                *

> Looking ahead, *I'm very proud of our Inogen associates and the progress made* in what has historically been a seasonally slower quarter. While we've been engaged in multiple initiatives to fuel future growth, *we've accelerated current growth, especially in the domestic direct-to-consumer and business-to-business sales channels.* I'm very pleased with the increased adoption in these markets with our best-in-class and patient-preferred products.

108.    Defendant Bauerlein further commented on the Company's sales prospects, stating that "[w]e expect direct-to-consumer sales to be our fastest-growing channel" and "domestic business-to-business sales to have a significant growth rate."

109.    In response to a question from an analyst concerning the "very quick[]" growth of B2B and "the long-term mix of business between B2B and direct-to-consumer," defendant Bauerlein reiterated the Company's misleading sales growth and TAM penetration figures to assure investors that the mix between the two channels was irrelevant to Inogen's financial prospects, stating:

> Yes.  So when you look at that, while certainly B2B has a lower gross margin profile, it also has much lower operating expenses associated with it.  So when we look at the market opportunity, we look to capture share both on the B2B side and the direct-to-consumer side because we're relatively agnostic on the bottom line.  What we have been doing, though, is continuing to invest in the B2C [business-to-consumers] side because *we're still very early in the market penetration curve.  As Scott said earlier, 9% or so penetration in the last data as of the end of 2016, we still have a long – we have a long ramp to go to continue to take share both on the direct-to-consumer side as well as the business-to-business side away from the tank-based business model*.  So our focus really is to make sure that we maintain a market leadership position and that we continue to grow the market both on [the] direct-to-consumer side and the B2B side and not to drive a specific mix in our business.  Now inherent in guidance in 2018 is that direct-to-consumer sales would be the fastest-growing channel.  So that would actually be a tailwind to gross margin expansion over the course of the year.

110.    That same day, the Individual Defendants caused Inogen to file a quarterly financial report with the SEC on Form 10-Q and stated in a section entitled "Business overview":

> *Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016.  The Company estimates based on 2016 Medicare data that the number of patients using portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States,* although the Medicare data does not account for private insurance and cash-pay patients in the market.  Based on 2016 industry data, the Company believes it was the leading worldwide manufacturer of portable oxygen concentrators.  The Company believes it is the only manufacturer of portable oxygen concentrators that employs a direct-to-consumer strategy in the United States, meaning the Company markets its products to patients, processes their physician paperwork, provides clinical support as needed and bills Medicare or insurance on their behalf.  To pursue a direct-to-consumer strategy, the Company's manufacturing competitors would need to meet national accreditation and state-by-state licensing requirements and secure Medicare billing privileges including Medicare competitive bidding contracts, as well as compete with the home medical equipment providers who many of the Company's manufacturing competitors sell to across their entire homecare business.

111.    Inogen's 10-Q was accompanied by substantially the same materially misleading SOX Certifications signed by Wilkinson and Bauerlein that were included in the Company's previous Form 10-K.

112.    The April 2018 statements above that were premised on (i) the low market penetration of POCs and (ii) Inogen's ability to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory LTOT patients were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 85, above.  The statements above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 86, above.  The statements above that were premised on Inogen's ability to grow its B2B sales of POCs to HMEs were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 87, above.   The statements in the SOX Certifications were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 88, above.

### *August 2018 False and Misleading Statements*

113.    On August 7, 2018, the Individual Defendants caused Inogen to issue a press release announcing its 2Q18 financial results for the period ended June 30, 2018, and again increasing its FY18 financial guidance.  In addition to reporting "record" 2Q18 revenues had grown "51.6% over the same period in 2017" to $97.2 million, and that net income had grown 75.2% during the same time period to $14.6 million, Inogen again significantly "increas[ed] its full year 2018 total revenue guidance range to $340 to $350 million, up from $310 to $320 million, representing growth of 36.3% to 40.3% versus 2017 full year results."  Inogen also "increas[ed] its full year 2018 GAAP net income and non-GAAP net income guidance range to $45 to $48 million, up from $38 to $41 million, representing growth of 114.3% to 128.5% compared to 2017 GAAP net income of

$21.0 million and growth of 57.5% to 67.9% compared to 2017 non-GAAP net income of $28.6 million," and "its guidance range for full year 2018 Adjusted EBITDA to $65 to $69 million, up from $62 to $67 million, representing 27.9% to 35.7% growth compared to 2017 results."

114.    Justifying its financial guidance, the press release again quoted defendant Wilkinson crediting the strong sales acumen of its salesforce, stating in pertinent part:

> The second quarter of 2018 was a notably strong quarter for us as we generated record revenue across all three sales channels, while also reporting record operating income . . . . *We are continuing to execute on our strategy to hire additional sales representatives and invest in advertising activities to increase consumer awareness as we believe this is still our most effective means to drive high revenue growth and portable oxygen concentrator adoption.*

115.    During the conference call held later that day, defendant Wilkinson again emphasized that the Company's strong direct-to-consumer sales were the result of Inogen's strong salesforce acumen, stating in pertinent part as follows:

> Given our recent success, our strategy is to continue to hire additional sales representatives and invest in advertising activities to increase consumer awareness, as we believe this is still our most effective means to drive growth of direct-to-consumer sales.
>
> *In fact, we now expect to have 500 Cleveland-based employees by year-end 2020, which is up from our original target of 240 employees.* We expect at least 2/3 of these employees to be sales representatives.
>
> *          *          *
>
> Looking ahead, I'm very proud of our Inogen associates and the progress made thus far in 2018. While we've been engaged in multiple initiatives to fuel future growth, *we've accelerated our current growth, especially in the domestic direct-to-consumer and business-to-business sales channels.* I'm very pleased with the increased adoption in these markets with our best-in-class and patient preferred products.

116.    Additionally, Bauerlein confirmed that "[w]e still expect direct-to-consumer sales to be our fastest-growing channel, domestic business-to-business sales to have a significant growth

rate and international business-to-business sales to have a solid growth rate, where the strategy will still be focused on the European market."

117.    In response to a question from an analyst about the ramp up of Inogen's Cleveland sales facility, defendant Wilkinson falsely confirmed: "[w]e are running a little bit ahead of our plan or schedule.  That's why we are increasing our own expectations as well as communication that over the 3-year period that we forecasted over that we would expect to have 500 people; about 2/3 of them would be sales personnel versus the original 240 people."

118.    Wilkinson also trumpeted the purported quality of the sales representatives Inogen hired for its Cleveland facility, telling participants on the call that, "[s]o far, I think we've done a great job.  We're very pleased with the quality of personnel that we've been able to attract."

119.    During the call, defendant Bauerlein misleadingly attributed the exceptional DTC performance to the increase of competent sales representatives:

> We have seen improved productivity across the facilities that have the seasoned reps, the California and Texas facilities, so that productivity is increasing, but of course, Cleveland is heavily influenced by the number of new reps in that facility. So really, the increase is primarily associated with just the increased capacity and not a productivity improvement, particularly if you're just looking at a base of the total number of employees and how their productivity has changed year-over-year.

120.    Addressing a question from an analyst "about the sustainability of business-to-business," Wilkinson and the analyst engaged in the following colloquy:

> [Analyst:] I was hoping you could talk about the **sustainability of business-to-business.**  This is one that can be lumpy, but it does look like it's really moving in the direction of full adoption here.  So I think **what people would really like to better understand is, what inning are we in, in terms of adoption from the larger players, the middle sized and the smaller players?  And how sustainable is it in the near term? And what could be [rallied] here in your opinion?**
>
> [Wilkinson:] Yes.  It's – I just mentioned in the previous question that **I think in the what inning we're in, second inning, maybe third inning, but certainly, we're in the first third of the game, if you will.**

As far as sustainability, I think that, that's a time horizon type of question, because over that *7 to 10 years*, I mean, we absolutely believe POCs will be the standard of care and the end game is, there will be a conversion.

121.    Defendant Wilkinson also assured investors that based on the Medicare data, "***we're still such a long way from a saturation point*** and only growing it 1 to 1.5 percentage points incrementally a year.  Even if the market takes off and grows at a much faster rate than historical, we're still quite a ways from the end of that curve."

122.    That same day, the Individual Defendants caused Inogen to file a quarterly financial report with the SEC on Form 10-Q and stated as follows:

> ***Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016.  The Company estimates based on 2016 Medicare data that the number of patients using portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States***, although the Medicare data does not account for private insurance and cash-pay patients in the market.  Based on 2016 industry data, the Company believes it was the leading worldwide manufacturer of portable oxygen concentrators.  The Company believes it is the only manufacturer of portable oxygen concentrators that employs a direct-to-consumer rental strategy in the United States, meaning the Company markets its products to patients, processes their physician paperwork, provides clinical support as needed and bills Medicare or insurance on their behalf.  To pursue a direct-to-consumer rental strategy, the Company's manufacturing competitors would need to meet national accreditation and state-by-state licensing requirements and secure Medicare billing privileges, as well as compete with the home medical equipment providers who many of the Company's manufacturing competitors sell to across their entire homecare business.

123.    Inogen's Form 10-Q was accompanied by substantially the same materially misleading SOX Certifications signed by defendants Wilkinson and Bauerlein that were included in the Company's previous Forms 10-K and 10-Q.

124.    The August 2018 statements above that were premised on (i) the low market penetration of POCs and (ii) Inogen's ability to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory LTOT patients were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 85, above.  The statements

above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 86, above.  The statements above that were premised on Inogen's ability to grow its B2B sales of POCs to HMEs were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 87, above.  The statements in the SOX Certifications were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 88, above.

### *September 2018 False and Misleading Statements*

125.   On September 12, 2018, certain members of Inogen's senior management attended the Morgan Stanley Healthcare Conference.  At one point during the conference, Morgan Stanley's Jaypreet Chadha asked, "[s]o one of the things that kind of – one of the pushes you made is to drive a direct-to-consumer sales strategy and move away from the rental market.  Now what's the thought process there?  How that's beneficial?"  Defendant Wilkinson explained the reasoning behind Inogen's focus on DTC cash sales, responding:

> Now as Jay said, over the last several years, we've shifted our focus from a rental business more to a retail business.  This really cuts out a lot of the red tape of the Medicare program.  It also – when you look at the reimbursement cuts that have been absorbed by Medicare, *the retail sale is more compelling compared to rentals than they once were when the reimbursement was much higher.  So we've shifted our intake criteria and focus.*  You have many patients that, when they call in, they've got a life-changing event where they're going to a wedding or the birth of a grandchild.  And sometimes to go through the red tape of Medicare can be a cumbersome and lengthy process.  So there is a big retail opportunity, life-changing products.  *People, we've proven, will definitely spend their own money to gain back their freedom and independence that they once had before their own oxygen.*  So because of those dynamics, we've kind of shifted away from rental.  Although, we still have rentals in our business, it's still on our P&L, but our primary focus has been on the retail side over the last several years.  That's what's really driven the growth of our business.

126.    Defendant Bauerlein then went on to explain the basis for Inogen's confidence that its Cleveland facility was hiring high quality sales representatives:

> So as you said, we've substantially increased what we think we're going to do in the Cleveland facility, both in terms of sales reps as well as support personnel. And we started – we actually opened the facility about a year ago, last August. ***So we've had now about 12 months experience of hiring and training people in that facility. And we've seen a great quality of reps and a great response to us wanting to enter the market and offer jobs there and that really is what's allowed us to say that we think we've been able to hire there and those people have come up the curve and produced what we wanted and obviously, you see that in our results. And so because of that, we think that because the market penetration is still so small***, it's important to capitalize on these market opportunities, particularly in the direct-to-consumer space. So because of that, we're looking to expand that sales force more. And we put a target out there that is based on our comfort level that we think that, that's an achievable goal by year-end 2020.

127.    The September 2018 statements above that were premised on (i) the low market penetration of POCs and (ii) Inogen's ability to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory LTOT patients were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 85, above. The statements above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 86, above.

### *November 2018 False and Misleading Statements*

128.    On November 6, 2018, before the opening of trading, the Individual Defendants caused Inogen to issue a press release announcing its 3Q18 financial results for the period ended September 30, 2018. The press release reported that Inogen achieved "[t]otal revenue of $95.3 million, up 38.0% over the same period in 2017" and "net income of $16.4 million, reflecting a 123.9% increase over the same period in 2017."

129.    But it was not all good news. The press release further announced that Inogen had reduced "its guidance range for full year 2018 Adjusted EBITDA to $60 to $62 million, down

from $65 to $69 million, representing growth of 18.0% to 22.0% versus 2017 full year results due to continued sales and marketing investments expected in the fourth quarter of 2018."

130.    The press release also revealed that while DTC sales growth rose to 66.3%, Inogen's domestic B2B sales growth was slowing and would see a significant deceleration to 32% growth from 56% in 2Q18.

131.    The release quoted defendant Wilkinson characterizing 3Q18 as "another successful quarter for [Inogen] as we generated *strong revenue across all three sales channels*," adding that the Company was "continuing to execute on [its] strategy to hire additional sales representatives and invest in advertising activities to increase consumer awareness" as it believed this was still its "most effective means to drive high revenue growth and portable oxygen concentrator adoption."

132.    During the conference call held later that morning, defendant Wilkinson again emphasized that the Company's strong DTC sales were the result of Inogen's strong salesforce acumen, stating in pertinent part as follows:

> Given our recent success, our strategy is to continue to hire additional sales representatives and invest in advertising activities to increase consumer awareness, as we believe this is still our most effective means to drive growth of direct-to-consumer sales.
>
> *                *                *
>
> Looking ahead to 2019, *we expect to remain a high-growth company and to continue to invest heavily in our sales force*, advertising efforts, and operations, in order to drive portable oxygen concentrator adoption worldwide.
>
> We also expect to open new international markets, such as China, by year-end 2020, and we plan to continue to invest in regulatory approval and business infrastructure in 2019 to support this initiative.

133.    Suggesting that Inogen's strategy to focus its efforts on out-of-pocket cash sales to patients, to the near exclusion of the rental market, was the winning long-term strategy, defendant

Wilkinson noted that the Company's DTC cash sales in 2017 "grew significantly," while its "direct rental patients on service declined."

134.    As for the hiring of additional sales representatives, an analyst asked, "it still seems like the direct sales expense is growing at a pretty healthy level.  So I assume that means more sales reps.  Why is that right or wrong?"  In response, Bauerlein misleadingly replied:

> Yes.  So as we said on the last quarter call, we are ahead of our expectations on the hiring side.  **Cleveland has been a great market for us to expand our sales base**, and we are expanding that sales base and continued to do that in the third quarter.  And really, we do that because **we know that there is a known return on those types of investments, and we are still early in the stages of POC penetration**.

135.    Defendant Wilkinson was later asked by an analyst about the market saturation of patients, specifically "into that pool of patients willing to buy out-of-pocket . . . [a]nd are you seeing any kind of signs of saturation of this pool of patients that are at least willing to buy out-of-pocket?"  In response, Wilkinson misleadingly confirmed that in addition to the Medicare data, other metrics the Company monitors supported the claim that there is no market saturation, stating that:

> Yes.  I mean, we do monitor all of those metrics.  And I mean, obviously, we're confident when we're making these investments that we're not at a point where you're at saturation.  And certainly, the Medicare numbers bear that out.  **Our other metrics bear that out.**  Otherwise, we wouldn't make such an investment.

136.    When an analyst asked about Inogen's plans for adding sales representatives for the DTC business, defendant Bauerlein responded that "we still are cautious there of trying to, again, make sure we don't get out ahead of how many people we can hire and effectively train.  So that's built into our models is looking at how many we can hire?  How many will leave?  What is the ramp-up curve?  All of that is factored into that guidance."

137.    In the slides that were presented with the Company's financial results, the Individual Defendants continued to report that the TAM was growing at a rate of 7% to 10%

annually, and it increased its estimate to 4 million Americans on LTOT by the year 2020 from its current estimate of 3 million Americans.  To justify that LTOT estimate, the slides referenced an estimate of approximately 30 million Americans living with COPD.  What investors did not know, however, was that this estimate was doubling the CDC's count of approximately 15 million Americans currently diagnosed with COPD.  The doubling of the CDC's estimate was baseless because the Individual Defendants came to this number by using an outdated 1988-1994 CDC study which merely found that 50% of COPD patients did not know they had COPD at the time of diagnosis.  The slide is shown below.



138.    That same day, the Individual Defendants caused Inogen to file a quarterly financial report with the SEC on Form 10-Q, which stated in pertinent part:

> *Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2017.  The Company estimates based on 2017 Medicare data that the number of patients using portable oxygen concentrators represents approximately 10.8% of the total addressable oxygen market in the United States*, although the Medicare data does not account

for private insurance and cash-pay patients in the market.  Based on 2016 industry data, the Company believes it was the leading worldwide manufacturer of portable oxygen concentrators.  The Company was the first oxygen therapy manufacturer to employ a direct-to-consumer marketing strategy, meaning the Company advertises directly to patients, processes their physician paperwork, and provides clinical support as needed.  While other manufacturers have also begun direct-to-consumer marketing campaigns to drive patient sales, the Company believes it is the only manufacturer of portable oxygen concentrators that employs a direct-to-consumer rental strategy in the United States, meaning the Company bills Medicare or insurance on their behalf.  To pursue a direct-to-consumer rental strategy, the Company's manufacturing competitors would need to meet national accreditation and state-by-state licensing requirements and secure Medicare billing privileges, as well as compete with the home medical equipment providers who many of the Company's manufacturing competitors sell to across their entire homecare business.

139.    But as to Inogen's FY18 financial guidance, the Form 10-Q stated that the Company still expected DTC sales to be its "fastest-growing channel," adding that domestic B2B sales would still have a "significant growth rate" and that international B2B sales would have a "solid growth rate."

140.    Additionally, Inogen's Form 10-Q was accompanied by substantially the same materially misleading SOX Certifications signed by defendants Wilkinson and Bauerlein that were included in the Company's previous Forms 10-K and 10-Q.

141.    The November 2018 statements above that were premised on the size of Inogen's TAM were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 83, above.  The statements above that were premised on the growth rate of Inogen's TAM were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 84, above.  The statements above that were premised on (i) the low market penetration of POCs and (ii) Inogen's ability to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory LTOT patients were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 85, above.  The statements above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable

growth of POC cash sales were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 86, above.  The statements in the SOX Certifications were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 88, above.

142.    Despite reporting otherwise strong earnings and sales guidance in order to keep the price of Inogen common stock from plummeting, the Company cut its FY18 EBITDA guidance from $65 to $69 million to $60 to $62 million due to sales and market expenditures which did not result in increased sales.  This announcement also partially revealed to the market that Inogen's increasing domestic B2B sales growth was unsustainable, slowing and would see a significant deceleration to 32% from 56% in 2Q18.

143.    As a result, the price of Inogen common stock declined $37.44 per share, or more than 19%, on November 7, 2018, representing a loss of more than $800 million in market capitalization.

144.    Regarding Inogen's 3Q18 results, one analyst wrote in a November 7, 2018 report that "[n]otably, B2B Domestic saw a significant deceleration vs. 1H18 – +32% vs. nearly 60% growth in the first half – which seems to have sparked concerns among investors that something has structurally changed in this business."

### *January 2019 False and Misleading Statements*

145.    Rather than backtrack from the misleading narrative it repeatedly peddled to investors in previous quarters, Inogen's senior management doubled down at the J.P. Morgan Global Healthcare Conference held on January 9, 2019.  For example, Wilkinson proclaimed that other TAM estimates were inaccurate because, "we've seen some people actually make some errors in market assessment because they don't fully understand the data."

146.    Defendant Wilkinson described the penetration of POCs into the LTOT market as in its infancy, as follows:

Now in the U.S., *the penetration of POCs, it's still really in its infant stages despite the compelling benefits for a patient, giving them freedom and mobility as well as the low total cost service*. The penetration in 2017, and that's the latest Medicare data available, is 2017, was about 11%. And you can kind of see at the bottom of the screen how that's progressed over the last several years. From '14 through '17, we've gone 7%, 8%, 9%, 11%. So POCs are actually the fastest-growing modality within oxygen therapy. But the market is still largely underpenetrated.

Our estimate is that over time, that POCs or portable oxygen concentrators will replace the tanks. And essentially, we've said, "90% of the patients that are ambulatory would be given a POC. If you assume that, believe that assumption, then it's 90% of the 73% ambulatory patients which means that at the end of the day, full penetration would be 65%. So again, we're a long way from the end of curve that's why we're bullish on continued investment in expanding our sales force.

147.     The slides used at the presentation referenced Inogen's estimate of approximately 30 million Americans living with COPD. What investors did not know, however, was that the Individual Defendants were doubling the CDC's count of approximately 15 million Americans currently diagnosed with COPD. The doubling of the CDC's estimate was baseless because Inogen came to this number by using an outdated 1988-1994 CDC study which merely found that 50% of COPD patients did not know they had COPD at the time of diagnosis. Although the Company did not rely on their misleading 7% to 10% TAM growth figures to claim the market was growing, it further incorrectly represented that within 15 years, the WHO projected COPD would become the leading cause of death in the world. The slide is shown below.



148.    The January 2019 statements above that were premised on the size of Inogen's TAM were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 83, above.   The statements above that were premised on the growth rate of Inogen's TAM were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 84, above.   The statements above that were premised on (i) the low market penetration of POCs and (ii) Inogen's ability to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory LTOT patients were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 85, above.

**THE TRUTH EMERGES**

### *The February 8, 2019 Muddy Waters Report*

149.    On February 8, 2019, stock research analyst Carson Block of the Muddy Waters firm published a detailed report challenging the claimed size of Inogen's TAM, claiming that the

Company had intentionally "created an egregiously false narrative" about its size and growth ("Muddy Waters Report"). Based on his research, Block reported that Inogen's TAM was "actually shrinking" and that the Company's "sales [would] peak no later than next year." According to Block:

> INGN embodies much of what is dysfunctional about today's capital markets: Misleading statements by management, shoddy market research presented as authoritative, thorough sell-side capture, and of course significant enrichment of insiders through stock sales.

150.    In his report, Block asserted that Inogen publicly made misleading statements about the size and growth of its TAM as far back as November 2013. The false and misleading statements during the Relevant Period were based on information contained in a "middle school student quality" report on oxygen devices issued by the firm WinterGreen Research ("WinterGreen"). Specifically, Block called out Inogen's claims regarding Inogen's TAM being 3 million Americans on LTOT and that it was growing at 7% to 10% annually. He found that the numbers were based on WinterGreen estimates that "appear to have little grounding in reality." Block noted that as "recently as November 2018, INGN's investor presentation contained a slide with the estimates of a three to four million user TAM growing at 7%-10% annually . . . [t]hose same slides . . . had consistently been in investor presentations since at least 2015."

151.    Block was particularly critical of WinterGreen's report, which Inogen based its TAM claims on, wherein Block asserts that WinterGreen plagiarized the *New York Times*. In reality, Inogen's TAM was only 1.3 million users according to Block.

152.    As support for his criticism of the materially misleading TAM figures, Block explained that, "[t]he key in analyzing CMS data is that the total number of users in a given year overstates the market at any given time due to users ceasing therapy (often due to death)." Because

HME providers refurbish and reuse POCs for seven to eight years for multiple patients, it follows that Inogen would be unable to penetrate the portion of the market which relied on used POCs.

153.    Block further criticized the market size assertions on the January 2019 slides published by Inogen (which were also repeated in Inogen's November 2018 slides).  Muddy Waters queried the World Health Organization ("WHO") with respect to the claim that the WHO expects COPD to become the leading cause of death globally, and reported that the WHO stated that Inogen's assertion, was "'most likely a mistake.'"  Similarly, he debunked management's claim on the same slide that there are approximately 15 million Americans diagnosed with COPD, and based on data from the CDC, approximately 15 million more are undiagnosed.  Block found Inogen's inference to be "greatly misleading" because it was based on an outdated 1988-1994 study in which the CDC "concluded that approximately 50% of COPD patients were unaware they had COPD prior to diagnosis."

154.    Block went on to undermine Inogen's overly confident claims that the TAM was growing, stating that Muddy Waters estimates "that from 2010 to 2017, the market shrank at a CAGR [compound annual growth rate] of -2.6%.  This is a far cry from the estimates of 7%-10% positive growth the company has been making since November 2013.  In our view, management has created a false narrative by presenting poorly-sourced estimates along with misrepresenting data from credible sources."

155.    Block refuted Inogen's claim that the shift of patients to Medicare Advantage supported their assertions that the TAM was growing because both the CMS Medicare data and the Kaiser Family Foundation data used to estimate Medicare Advantage trends concluded that the market was shrinking.

156.    Further in his report, Block criticized Inogen's expectation of 90% POC penetration

for ambulatory COPD patients as "greatly unrealistic" because:

> Many ambulatory patients are not feasible potential users because they are healthy
> enough that they only need oxygen therapy while they sleep, and POCs do not have
> sufficient battery life to make them convenient to use overnight.  Others with more
> advanced lung disease that can still get around or out of the house need a strong,
> continuous flow of oxygen, which POCs cannot provide.

157.    Block also cited an industry report which found an "overwhelming consensus" that

"portable oxygen therapy is appropriate for up to only half of ambulatory oxygen therapy users."

158.    Block then criticized Inogen's management for intentionally (or at the very least

recklessly) misstating the TAM and TAM growth.  For example, Block noted:

> It appears that management became aware of investor concerns about its market
> estimates late last year.   As recently as November 2018, INGN's investor
> presentation contained a slide with the estimates of a three to four million user TAM
> growing at 7%-10% annually.   But since then, management has either de-
> emphasized or entirely stopped presenting these poor estimates.  Those same slides,
> which had consistently been in investor presentations since at least 2015, were
> removed from presentations given on January 9 and January 16, 2019.  Therefore,
> we believe that management is now engaged in a lowkey CYA exercise.

159.    Block called out Inogen's attempts to justify their shifting narrative:

> In fact, at their most recent investor conference on January 16, 2019, management
> managed to go through an entire presentation without mentioning the growth of the
> oxygen market, which we believe is a first for INGN's executive team.
> Unfortunately, management is still attempting to obscure the fact that the total
> market is declining.  The recent disappearance of the line about 7% to 10% growth
> came in conjunction with management's new narrative: U.S. beneficiaries are
> shifting to Medicare Advantage, and therefore analysts cannot gauge the oxygen
> market's growth by looking at Medicare data alone.

160.    On this news, the price of Inogen common stock declined by more than $3 per

share, declining from its close of $139.74 per share on February 7th to close at $136.72 per share

on February 8th, representing a loss of more than $65 million in market capitalization.

**_The February 12, 2019 Citron Report_**

161.    Then, on February 12, 2019, Citron Research issued a report titled "Citron Exposes Elder Abuse Within Inogen's Sales Practices" ("Citron Report").  The Citron Report illuminated what Citron characterized as the Company's "dirty" reseller network and systematic abuse of elders by Inogen and resellers through their deceptive sales practices and shoddy sales network, stating that less than 10% of Inogen's sales come from Medicare despite the 75+ average age of its customers.  According to the Citron Report, Inogen had been conspiring with its reseller network to dominate Google listings, posting fake reviews, and using tactics to deceive and pressure the elderly into buying its oxygen concentrators by, among other things, falsely telling them that Medicare would not cover the cost of oxygen concentrators sold by other companies (at prices lower than Inogen's) in order to induce them to purchase Inogen's devices at prices the market would not have otherwise supported.

162.    Additionally, according to the Citron Report, the top reseller of Inogen products was "secretly controlled by a convicted felon who was recently released after 5 years in federal prison" after being sentenced for deceptive marketing practices, such as posting fake reviews. These are the same types of deceptive marketing practices Inogen's resellers were committing, and which were exposed by Citron.  The Citron Report detailed how increased sales through these nefarious resellers had artificially increased Inogen's B2B sales, sales increases that Citron opined were not sustainable on a long-term basis.  Based on its analysis of Inogen's financial reports and the firm's own research, Citron placed a target of just $46 per share on Inogen common stock.

163.    According to its report, Citron called and inquired about a POC with Inogen's biggest reseller, 1stClass Medical, and learned firsthand that the sales representative was lying about patient eligibility for Medicare reimbursements for POCs.  Citron accused two other resellers, Pure Medical and Main Clinic Supply, of posting fake internet reviews to mislead

patients about Medicare eligibility and to scare patients away from more economically priced POCs by deceptively warning patients to "'Beware of Cheap Machines.'"

164.    Citron also investigated Inogen's own sales practices by interviewing Inogen sales representatives, before ultimately concluding that Inogen leveraged its position as being the only Medicare approved DME provider of oxygen therapy in certain markets to steer patients, who would otherwise be eligible for Medicare reimbursement, to out-of-pocket cash sales "through evasive and deceptive tactics." However, according to its report, Citron realized that Inogen's ability to corner certain markets had ended in 2019 due to a change in Medicare payment rules that allowed patients to obtain POCs from any enrolled Medicare supplier.

165.    Citron further backed its findings with the accounts of various current and former employees and customers, as shown in the following slides:





## Inogen's Scheme Can be Found in Customer Reviews



"These people prey on sick and generous folks, it's inconceivable that a company in medical industry would be so unprofessional." – Customer (January 17, 2019)

"This company is suppose to cater to the elderly to me they rip off the elderly." – Customer (August 13, 2018)

"FRAUD by salesperson: Before buying a $2500 portable oxygen unit from Inogen I asked the sales rep if Medicare covered such equipment and he said no. This was blatantly deceptive. I discovered the truth when the unit I purchased from Inogen with my credit card for $2500 in December 2017 failed. My oxygen level dipped into the 70s and I am still having health issues (lethargy, fatigue, etc.) from the failure. I talked to another equipment provided who assured me that Medicare indeed covered the equipment. That company got me another unit and Medicare paid. My daughter, Valerie Mills, phoned Inogen and complained that I had been defrauded. The rep confirmed that Medicare does pay for the units but Inogen is not an authorized provider in my area. The rep deliberately withheld that information from me to make the sale." – Customer (August 7, 2018)

"I was intending to use my Medicare benefits to help with the purchase of the device… it is fairly easy to understand what's going on. It's what is referred to as the old "bait an switch". – Customer (November 21, 2017)

© Copyright 2019 | Citron Research | www.citronresearch.com | All Inquiries – info@citronresearch.com

17

166.    On this news, the price of Inogen common stock—which had since partially recovered—declined further, this time falling by more than $4 per share, declining from its close of $142.20 per share on February 11th to close at $138.05 per share on February 12th, representing a loss of more than $87 million in market capitalization.

*__February 26, 2019 Partial Disclosures and False and Misleading Statements__*

167.    After the close of trading on February 26, 2019, the Individual Defendants caused Inogen to publish a press release announcing its 4Q18 and FY18 financial results, reporting: "[r]ecord total revenue of $358.1 million, up 43.6% versus 2017"; "[r]ecord sales revenue of $336.0 million, up 49.0% versus 2017"; "[DTC] sales rose 50.4% over the same period in 2017, primarily due to an increase in the number of sales representatives and associated consumer advertising"; and "GAAP net income of $51.8 million, reflecting a 146.9% increase versus 2017 and a 14.5% return on revenue."

168.    The press release, however, partially revealed B2B issues, stating that "[w]hile domestic business-to-business sales growth was primarily driven by continued adoption by

traditional home medical equipment providers and internet resellers, order activity did slow from one national homecare provider in the fourth quarter of 2018." Inogen's 4Q18 B2B sales further slowed to a growth rate of only 16.0%.

169.     In addition, the press release disclosed full year 2018 results for "[r]ental revenue of $22.1 million, down 7.7% versus 2017."

170.     During a conference call the Company hosted with analysts and investors later that day, defendant Wilkinson backtracked on Inogen's prior TAM estimates, stating:

> It's a good question . . . and there's no change to our TAM estimate of 2.5 million to 3 million patients. . . . We've looked at it a few different ways. We keep landing in that same area. I will emphasize that we've always said 2.5 million to 3 million, we haven't said 3.0 or anything, *it's kind of [an] acknowledgment that it's an estimate, it's probably a tougher estimate now than it used to be* because of the movement within the data sources. But I think, the key is it's not 20 million, it's not 500,000. We feel very good about that estimate, no change to that.

171.     Wilkinson further disclosed on the conference call that B2B sales growth slowed that quarter: "While business-to-business sales continued to grow, primarily due to strong demand by traditional home medical equipment providers and Internet resellers, *order activity did slow from one national home care provider in the fourth quarter of 2018*."

172.     When an analyst asked about the return on investment in the sales and marketing teams, Bauerlein partially revealed what had already been obvious to Inogen:

> [T]here were some inefficiencies as we did scale this business so quickly. And there were some learnings there as we increased the advertising spend, we didn't see as much efficiencies there as we had hoped, and we really are focused on that now as a key area that we're looking at in 2019, to improve our overall results, is to look at getting those reps fully up to speed and also making sure we have effective and efficient sources for the lead sources that we need.

173.     Defendant Bauerlein also partially revealed information suggesting the market was closer to being saturated than they had previously represented to investors. Bauerlein stated that

she expected "the rate of sales force expansion in 2019 should be lower than the rate for the last couple of years."

174.    Similarly, the Individual Defendants caused Inogen to move up its estimated timetable for full POC penetration of the B2B market (despite the slowdown in orders from the one national homecare provider).  The Company now disclosed that instead of the seven-to-ten years estimate discussed during the 2Q18 conference call, full adoption would occur within five years.  When questioned by an analyst about the change, defendant Wilkinson also back-pedaled on the Company's previous claims:

> Again, I'll say it's an estimate.  We're seeing some of the challenges that people have.  Could it take longer?  Yes, it could take longer.  Could it go faster?  Yes, it could.  For us, again, that's why it's so important that we have access to the market ourselves so that we have more control of our own destiny.

175.    Confirming Muddy Waters' suspicions, the Individual Defendant also significantly reduced Inogen's growth rate of the market for LTOT from 7% to 10% per year down to "low single digits."  As defendant Wilkinson explained:

> While Medicare beneficiary data showed a decline in 2017, when taking into account the shift to Medicare advantage, private insurance, retail sales and the expanding cap base, we believe that overall patient growth was in the low single digits in 2017, and we expect that trend to continue for the next few years.

176.    On this news, the price of Inogen common stock fell even further, plummeting more than 24% from a close of $140.06 per share on February 26, 2019 to $106.28 per share on February 27, 2019, representing a loss of more than $736 million in market capitalization.

177.    A Medtech Insight article titled "Inogen's Stock Collapses After Earnings Call Addressing Short-Seller Concerns," dated February 28, 2019, noted that Inogen's share price "plummeted after its most recent earnings call where the company's CEO seemed to acknowledge it did not trust its own research firm that gave it a glowing market report and prospective analysis." The article quoted Muddy Waters' Block, attributing the decline in share price "to the evasiveness

of TAM size, their assessment of recent low single digit growth, and downshifting the long-term growth language to five years from 7-10."

178.     Undaunted, the Individual Defendants continued to mislead investors.  During the Company's February 26, 2019 conference call with analysts and investors, defendant Wilkinson took the opportunity to dispute the findings uncovered by Muddy Waters and Citron.  But in doing so, he further misled the market by stating that the Company's prior figures were from an outdated 2015 WinterGreen report and were now stale, rather than the 2017 report which was the version criticized by Muddy Waters.  Wilkinson continued with a litany of misleading statements:

> [R]educed reimbursement rates as a result of competitive bidding, enhanced Medicare coverage and billing requirements and other factors have created access issues and ***caused the cash pay market, which is not reflected in the Medicare data, to grow substantially for both new and existing patients.***
>
> *            *            *
>
> Lastly, we are an accredited home care provider, licensed to provide respiratory products in all 50 states, ***heavily regulated by Medicare and the FDA and subject to frequent audits to maintain these accreditations and licenses and we take compliance with the law seriously.***
>
> Specifically, we have compliance requirements in place for our authorized Internet resellers.  And without commenting on any specific Internet resellers, we expect that our Internet resellers abide by all applicable laws and regulations.
>
> *            *            *
>
> While some patients would rather receive products using their insurance benefits, the reimbursement dynamics in oxygen therapy have led some patients to seek better options, even if it means paying out of pocket.  We are proud that we and our customers can make a difference in these patient's lives.

179.     Defendant Wilkinson further touted Inogen's DTC sales force and marketing team, describing them as a "fantastic asset."

180.     In Inogen's 2018 10-K, filed the same day with the SEC, the Company lowered its rate of oxygen therapy patient growth from 7% to 10% to the "low single digits," but continued to

assert that "[w]e estimate approximately 3 million patients in the United States used long-term oxygen therapy in 2017 based on 2017 Medicare data and our estimate of the size of the Medicare market relative to the total market."

181.     The 2018 10-K also reiterated the misleading market penetration figures, stating that "[b]ased on 2017 Medicare data, we estimate the number of patients using portable oxygen concentrators represents approximately 10.8% of the total addressable oxygen market in the United States, although the Medicare data does not account for private insurance, Medicare Advantage, Medicaid and cash-pay patients in the market."

182.     Additionally, Inogen's Form 10-K was accompanied by substantially the same materially misleading SOX Certifications signed by Wilkinson and Bauerlein that were included in the Company's previous Forms 10-K and 10-Q.

183.     The February 2019 statements above that were premised on the size of Inogen's TAM were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 83, above.  The statements above that were premised on (i) the low market penetration of POCs and (ii) Inogen's ability to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory LTOT patients were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 85, above.  The statements above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 86, above.  The statements in the SOX Certifications were materially false and/or misleading at the time they were made for the reasons summarized at ¶ 88, above.

### _May 7, 2019 Partial Disclosures_

184.     After the close of trading on May 7, 2019, the Individual Defendants caused Inogen to issue a press release announcing its 1Q19 financial results and conducted a conference call with

Inogen investors and stock analysts.  As quoted in the press release, defendant Wilkinson disclosed that despite Inogen's intentional shift away from the Medicare rental reimbursement market, it was actually a major headwind in generating future revenue.  Even worse, B2B sales continued to decrease.  As quoted in the press release, Wilkinson said:

> The first quarter of 2019 was a tough quarter for us given the ***decline in domestic business-to-business sales*** and the increased direct-to-consumer sales and marketing expenditures . . . .  We believe there is still a large opportunity for portable oxygen concentrator adoption worldwide; however, ***there are patient access issues given the current reimbursement environment*** and the restructuring challenges that some providers are facing in converting their oxygen business to a non-delivery model.  As a result, we are focused on multiple initiatives to drive sales and marketing efficiencies and build a more predictable revenue stream over time.

185.    The press release further revealed that the POC market was not as grand as Inogen previously described:

> ***Inogen is reducing its full year 2019 total revenue guidance to $405 to $415 million, down from $430 to $440 million***, representing growth of 13.1% to 15.9% versus 2018 full year results.  While the Company still expects direct-to-consumer sales to be its fastest growing channel, ***it plans to slow the pace of hiring in 2019*** and place more emphasis on sales representative productivity.  Inogen still expects international business-to-business sales to have a solid growth rate, but ***now expects domestic business-to-business sales to have a slightly negative growth rate***.  Given the difficult growth comparisons Inogen faces in the domestic business-to-business channel, the restructuring challenges of some providers, and its rental plan, ***it expects negative growth in the domestic business-to-business channel in the second quarter of 2019 compared to the second quarter of 2018***, with modest growth in the back half of 2019 compared to the back half of 2018.

186.    The press release also stated that Inogen was: "reducing its full year 2019 GAAP net income guidance range to $36 to $38 million, down from $40 to $44 million, compared to 2018 GAAP net income of $51.8 million"; "reducing its full year 2019 operating income guidance range to $42 to $44 million, down from $46 to $50 million, representing growth of 10.8% to 16.1% versus 2018 full year results"; and "reducing its full year 2019 Adjusted EBITDA guidance range

to $66 to $68 million, down from $67 to $71 million, representing growth of 7.7% to 11.0% versus

2018 full year results."

187.    During an investor conference call held later that day, defendant Wilkinson

disclosed to investors that the new sales representatives were not as effective as earlier hires, and

alerted investors to additional issues in both the DTC and B2B markets.  He stated:

> Looking at the first quarter of 2019, we generated total revenue of $90.2 million,
> reflecting growth of 14.1% over the first quarter of 2018.
>
> Direct-to-consumer sales of $39 million in the first quarter of 2019 increased 35.9%
> over the first quarter of 2018 primarily due to increased sales representative
> headcount and associated consumer advertising.  ***However, the sales reps we hired
> in the second half of 2018, on average, took longer to come up the productivity
> curve than our historical target and were not at their full potential in the first
> quarter.***
>
> ***Moving forward, we plan to slow down the addition of new sales representative
> hires and focus on improving the productivity of our sales team.***  Over the last
> 2 quarters, we have also applied with it a separate rental team that will focus
> exclusively on new rental additions to drive overall sales productivity.  And we
> plan to roll this out across our entire group in the coming quarters.
>
> As we've continued to grow our sales staff and the associated number of required
> leads has grown, we have seen the cost per generated lead trend higher than
> historical averages.  We believe we will see increased productivity of our sales reps
> throughout 2019, which should reduce our overall cost per sale despite expected
> increased marketing spend.
>
> ***First quarter 2019 domestic business-to-business sales of $26.1 million decreased
> 7% from the first quarter of 2018 primarily due to a decline in sales to our private
> label partner.***  These sales declines were a partner due to one large national home
> care provider who significantly reduced orders in the first quarter of 2019 as
> compared to the same period in 2018.
>
> Specifically, this provider who we discussed in our last earnings call accounted for
> revenue of $700,000 in the first quarter of 2019, down from $9.3 million in the first
> quarter of 2018.

188.    The Individual Defendants retreated from their previous misleading assurances that

Inogen could achieve its growth by focusing on sales within the DTC and B2B markets by

announcing that it had created a separate rental team.  Moreover, defendant Wilkinson informed

investors on the conference call that "[w]e do plan to slightly change our rental intake criteria to accept more new rental patient additions to increase access to patients who otherwise could not obtain a POC from their current home care provider."

189.    To attempt to offset the lowered expectations for the Company, the Individual Defendants relaxed Inogen's rental intake criteria to approve rentals closer to the end of the 36-month rental-period for Medicare reimbursements.  Wilkinson described it as follows:

> But we are going to relax the last criteria upfront.  When we talk about that criteria, we've got a minimum number of billable months remaining for a rental patient or an insurance patient that we require to consider bringing them on service and deploying a POC.  So we can relax that criteria and it creates more a bigger portion of the leads that come in every month to become rental candidates.

190.    In stark contrast to the Company's earlier praise of its Cleveland salesforce, defendant Wilkinson confirmed that the sales representatives hired in 3Q18 were underperforming and also blamed the productivity issues on insufficient support from the Cleveland management and seasoned representatives.  Wilkinson described the issues as follows:

> Let me back up to probably the first half of '18 is kind of a benchmark.  We started to hire at a heavier rate than historical in the first half of the year.  And things, I'll say, that even exceeded our expectations.  As we continued and actually cranked up hiring to an even higher rate as we went into the third quarter, that's where things didn't meet our expectations.  And as I said in my prepared remarks, when we look at productivity of reps, they no longer were matching what we have seen from a historical productivity standpoint.  We got a little bit ahead of ourselves on management.  I think we mentioned that in the previous call that we had to shore up our management but we found that we still need to invest in further training on management so that there are even better resource for the new reps that we have. If you look at most of the incremental hiring is in our Cleveland facility.  That's where we have space.  So that's why most of the hiring is there.  But the folks are not surrounded by 5-year veteran reps there.  It's a relatively new facility.  So we need to make an even bigger investment into training and support of those new reps to drive that productivity.

191.    On this news, the price of Inogen common stock plummeted again, falling more than 25%, from a close of $91.14 per share on May 7, 2019 to a close of $67.79 per share on May 8, 2019, representing a loss in market capitalization of more than $509 million.

192.    On May 8, 2019, the Motley Fool posted an article titled "Why Inogen Shares Are Plunging Today."  In the author's view, "[t]he mixed quarterly results weren't great, but the huge contraction in the share price appears to be related to management's full-year guidance updates."

## *August 7, 2019 Disclosures*

193.    Finally, on August 7, 2019, before the market opened, Inogen published a press release announcing its dismal 2Q19 financial results.  It stated in part:

> Total revenue for the three months ended June 30, 2019 rose 3.9% to $101.1 million from $97.2 million in the same period in 2018.  Direct-to-consumer sales rose 14.0% over the same period in 2018, primarily due to increased sales representative productivity, partially offset by an approximate 17% reduction in sales representative headcount against the comparative period of the prior year. Domestic business-to-business sales declined 10.0% from the same period in 2018, primarily due to a decline in sales to the Company's private label partner.
>
> *        *        *
>
> Operating income for the three months ended June 30, 2019 declined to $12.1 million, or 12.0% of revenue, down from $14.0 million, or 14.4% of revenue, in the comparative period in 2018, primarily due to higher marketing expense.
>
> *        *        *
>
> In the second quarter of 2019, the Company reported net income of $10.2 million compared to $14.6 million in the second quarter of 2018.  Earnings per diluted common share was $0.45 in the second quarter of 2019 versus $0.65 in the second quarter of 2018.

194.    The press release also quoted Wilkinson as stating as follows:

> We reached a new milestone for Inogen with over $100 million in revenue in the second quarter of 2019, while we focused on improving the productivity of our direct-to-consumer salesforce.  ***While we were able to improve their productivity in the second quarter of 2019, the level of sales representative attrition was higher than expected as many of the representatives hired in 2018 were unable to meet our sales targets, . . .  I expect the reduced sales capacity will be a headwind to direct-to-consumer growth for the remainder of 2019.  In addition, we have continued to see some hurdles for our business-to-business partners, which we expect will be a headwind to growth in the domestic business-to-business channel in the short-term.***  In spite of these challenges, we are still optimistic about the medium to long-term opportunity for portable oxygen concentrator adoption worldwide, and we are focused on increasing our salesforce, enhancing salesforce

productivity, helping our partners overcome their restructuring challenges and capital constraints, and maintaining our market leadership position.

195.    As if these results were not bad enough, Inogen slashed its net income guidance for fiscal 2019 from a range of between $36 and $38 million, to between $23 and $25 million.  It also reduced its full year 2019 total revenue guidance to between $370 and $375 million, down from $405 to $415 million, blaming "reduced expectations of the direct-to-consumer sales channel" because of "the lower sales headcount compared to the same period in the prior year due to the higher attrition of representatives hired in 2018 who did not reach the sales targets."  Inogen also stated that it expected total revenue *to decrease* in 3Q19 compared to 3Q18 "due to the tougher comparables in its domestic business-to-business sales channel and secondarily due to the reduction in direct-to-consumer sales in the comparative periods."

196.    On this news, the price of Inogen common stock dropped again, falling more than 23%, from a close of $55.18 per share on August 6, 2019 to a close of $42.32 per share on August 7, 2019, representing a loss in market capitalization of more than $280 million.

**C.    Company Insiders Sold Their Inogen Shares Based Upon Material, Adverse Nonpublic Information**

197.    Not all Inogen stockholders were harmed by the Individual Defendants' actions. Indeed, some of the Individual Defendants made use of their insider knowledge of the false and misleading statements about the Company's business operations, and handsomely profited from their self-serving insider selling activities.

198.    During the Relevant Period, while in possession of material, adverse, non-public information, Defendants Wilkinson, Bauerlein, Lukatch, Huggenberger, Anderson-Ray, McFarland, and Rider—all fully aware of the unlawful circumstances driving the Company's stock to highly-inflated levels—engaged in selling of their personal stock, collectively unloading a

staggering total of at least 291,250 shares of Inogen common stock for proceeds exceeding $43 million. These insider sales were both unusual and suspicious in volume and timing.

199.    According to Inogen's Insider Trading policy, which is contained within Inogen's Code of Ethics: "No employee or director in possession of material, non-public information may trade Inogen's securities (or advise others to trade) from the time they obtain such information until after adequate public disclosure of the information has been made." Because the Individual Defendants were in possession of material, adverse nonpublic information at the time of their trades, they are in violation of this policy and consequently they breached their fiduciary duties to the Company.

200.    Defendant Wilkinson, while he was in possession of material, adverse nonpublic information, sold 57,037 shares of his personally held Inogen stock at artificially inflated prices for proceeds of $8,555,054 between January 16, 2018 and August 1, 2018. Subsequent to these sales, Wilkinson has not sold any additional Inogen shares.

201.    Defendant Bauerlein, while she was in possession of material, adverse nonpublic information, sold 84,260 shares of her personally held Inogen stock at artificially inflated prices for proceeds of $10,578,748 between February 9, 2018 and June 11, 2018. Subsequent to these sales, Bauerlein has not sold any additional Inogen shares.

202.    Defendant Lukatch, while he was in possession of material, adverse nonpublic information, sold 8,000 shares of his personally held Inogen stock at artificially inflated prices for proceeds of $1,248,309 between December 1, 2017 and November 6, 2018. Prior to these sales, Lukatch had sold only 11,500 shares of Inogen stock ever. Subsequent to these sales, Lukatch has not sold any additional Inogen shares.

203.    Defendant Huggenberger, while he was in possession of material, adverse nonpublic information, sold 120,106 shares of his personally held Inogen stock at artificially inflated prices for proceeds of $19,763,206 between November 15, 2017 and January 15, 2019. Subsequent to these sales, Huggenberger has not sold any additional Inogen shares.

204.    Defendant Anderson-Ray, while he was in possession of material, adverse nonpublic information, sold 4,000 shares of his personally held Inogen stock at artificially inflated prices for proceeds of $689,980 between January 2, 2018 and October 1, 2018.  Subsequent to these sales, Anderson-Ray has not sold any additional Inogen shares.

205.    McFarland, while he was in possession of material, adverse nonpublic information, sold 8,125 shares of his personally held Inogen stock at artificially inflated prices for proceeds of $1,390,889 between March 1, 2018 and November 8, 2018.  Prior to these sales, McFarland had not ever sold any Inogen shares.  Subsequent to these sales, McFarland also has not sold any additional Inogen shares.

206.    Defendant Rider, while she was in possession of material, adverse nonpublic information, sold 9,722 shares of her personally held Inogen stock at artificially inflated prices for proceeds of $1,696,905 between February 26, 2018 and September 6, 2018.  Prior to these sales, Rider had not ever sold any Inogen shares.  Subsequent to these sales, Rider also has not sold any additional Inogen shares.

207.    The Insider Selling Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known material, adverse, non-public information about the business operations and financial condition of Inogen, and caused the price of the Company's stock to trade at artificially-inflated prices, while at the same time the Insider

Selling Defendants were disposing of tens of millions of dollars' worth of Company stock, in violation of the law and the Company's own insider trading policies.

208.    Thus, the Insider Selling Defendants had a duty not to sell shares while in possession of material, adverse, non-public information concerning Inogen's business, finances, and prospects.  In breach of these duties, the Insider Selling Defendants sold shares at artificially-inflated prices in order to reap personal profits.

## VIII.    THE DIRECTOR DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS IN INOGEN'S PROXY STATEMENTS IN FURTHER BREACH OF THEIR FIDICUIARY DUTIES

209.    Plaintiff's allegations with respect to the misleading statements in Inogen's Proxy Statements are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

210.    On March 27, 2018, the Director Defendants caused Inogen to issue its Proxy Statement for the 2018 Annual Meeting of Shareholders to be held on May 10, 2018 ("2018 Proxy").  In the 2018 Proxy, the Director Defendants solicited stockholder votes to, among other things, reelect defendants Greer, Rider, and Beardsley to the Board.  In support of their bid to reelect defendants Greer, Rider, and Beardsley, the Director Defendants highlighted their duties and their supposedly successful oversight of the Company, as set forth below.  The Director Defendants negligently issued misleading statements with respect to these solicited votes.

211.    On March 26, 2019, the Director Defendants caused Inogen to issue its Proxy Statement for the 2019 Annual Meeting of Shareholders to be held on May 9, 2019 ("2019 Proxy").  In the 2019 Proxy, the Director Defendants solicited stockholder votes to, among other things,

reelect defendants Wilkinson, Anderson-Ray, and McFarland to the Board.  In support of their bid to reelect defendants Wilkinson, Anderson-Ray, and McFarland, the Director Defendants highlighted their duties and their supposedly successful oversight of the Company, as set forth below.  The Director Defendants negligently issued misleading statements with respect to these solicited votes.

212.    The 2018 Proxy and the 2019 Proxy describe the duties of the Board's Audit Committee as follows:

> Our *Audit Committee oversees our corporate accounting and financial reporting process and assists our Board in monitoring our financial systems*.  Our Audit Committee also:
>
> *         *         *
>
> •        reviews our financial statements and our critical accounting policies and estimates;
>
> •        *oversees risk management matters;*
>
> *         *         *
>
> •        *reviews the adequacy and effectiveness of our internal controls*; and
>
> •        reviews and discusses with management and the independent auditors the results of our annual audit, our annual and quarterly financial statements and our publicly filed reports.
>
> *         *         *
>
> *Our Audit Committee assists our Board in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting and disclosure controls and procedures, legal and regulatory compliance*, and discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management.  *Our Audit Committee also reviews our major financial risk exposures and the steps management has taken to monitor and control these exposures.  In addition, our Audit Committee monitors certain key risks on a regular basis throughout the fiscal year, such as risk associated with internal control over financial reporting and liquidity risk.*

213.   The 2018 Proxy and the 2019 Proxy described the Company's Code of Ethics as follows:

> Our Board has adopted Corporate Governance Principles.  These principles address items such as the qualifications and responsibilities of our directors and director candidates and corporate governance policies and standards applicable to us in general.  ***In addition, our Board has adopted a Code of Ethics and Conduct that applies to all of our employees, officers and directors, including our Chief Executive Officer, Chief Financial Officer, and other executive and senior financial officers.***  The full text of our Corporate Governance Principles and our Code of Ethics and Conduct is posted on our website at www.inogen.com in the Corporate Overview – Governance Documents section of our Investors webpage. We intend to post any amendments to our Code of Ethics and Conduct, and any waivers of our Code of Ethics and Conduct for directors and executive officers, on the same website.

214.   With respect to "risk oversight," the 2018 Proxy and the 2019 Proxy stated as follows:

> ***While our Board is ultimately responsible for risk oversight, our Board committees assist our Board in fulfilling its oversight responsibilities in certain areas of risk***. . . .  Finally, our full Board reviews strategic and operational risk in the context of reports from the management team, receives reports on all significant committee activities at each regular meeting, and evaluates the risks inherent in significant transactions.

215.   With respect to the "Executive Summary," the 2018 Proxy stated in part:

*Fiscal 2017 Business Performance*

> ***Our fiscal 2017 financial and operating performances continued to be strong as we progressed in our efforts to enhance our business and create and sustain long-term value in several of our key business metrics.  With our leadership team, we demonstrated strong year-over-year growth in revenues, net income and liquidity, all while effectively managing our costs.***

Our fiscal 2017 achievements include:

•       Revenue of $249.4 million, an increase of 23.0% from 2016;

•       GAAP net income of $21.0 million, or $0.96 per diluted share, compared to GAAP net income of $20.5 million or $0.97 per diluted share in 2016;

•       Non-GAAP net income of $28.6 million, an increase of 39.3% from 2016;

• Non-GAAP adjusted earnings before interest expense, interest income, provision for incomes taxes, depreciation and amortization, and stock-based compensation (Adjusted EBITDA) of $50.8 million, an increase of 17.2% from 2016;

• Adjusted Operating Income of $37.4 million;

• Gross margin of 48.6% compared to 48.0% in 2016; and

• Cash and marketable securities of $173.9 million, an increase of $60.1 million from 2016.

216. With respect to the "Executive Summary," the 2019 Proxy stated in part:

*2018 Business Performance*

**Our 2018 financial and operating performances continued to be strong as we progressed in our efforts to enhance our business and create and sustain long-term value in several of our key business metrics.  With our leadership team, we demonstrated strong growth in revenues, net income and liquidity for our stockholders in 2018 compared to 2017.**

Our 2018 achievements include:

• Revenue of $358.1 million, an increase of 32.3% from 2017;

• GAAP net income of $51.8 million, or $2.30 per diluted share, compared to GAAP net income of $21.0 million or $0.96 per diluted share in 2017;

• Non-GAAP net income of $51.8 million, an increase of 81.4% from 2017, compared to non-GAAP net income of $28.6 million in 2017;

• Non-GAAP adjusted earnings before interest expense, interest income, provision for incomes taxes, depreciation and amortization, and stock-based compensation (non-GAAP Adjusted EBITDA) of $61.3 million, an increase of 19.7% from 2017, compared to non-GAAP Adjusted EBITDA of $50.8 million in 2017;

• Non-GAAP Adjusted Operating Income of $51.2 million, an increase of 36.9% from 2017, compared to non-GAAP Adjusted Operating Income of $37.4 million in 2017;

• Gross margin of 49.9% compared to 48.6% in 2017; and

• Cash and marketable securities of $240.3 million as of December 31, 2018, an increase of $66.4 million, compared to cash and marketable securities of $173.9 million as of December 31, 2017.

217.     Accordingly, the 2018 Proxy and the 2019 Proxy incorrectly claimed and misled stockholders into believing that: (i) the Board was engaged in appropriate and active risk oversight of the Company, including compliance with the Code of Ethics; (ii) the Audit Committee exercised appropriate oversight of the Company's accounting and financial reporting, disclosure controls and procedures, and the overall effectiveness of the Company's internal controls; (iii) the Company achieved strong year-over-year growth in revenues, net income, and liquidity while effectively managing its costs based, at least in part, on the effective oversight by the Board; and (iv) as a result, defendants Greer, Rider, and Beardsley (in 2018) and Wilkinson, Anderson-Ray, and McFarland (in 2019), as members of the Audit Committee and/or Board, were well-informed about and exercised appropriate oversight over Inogen's operations, risk management, public disclosures, and controls.

218.     In reality, the Board and its Audit Committee, which include defendants Greer, Rider, Beardsley, Wilkinson, Anderson-Ray, and McFarland (who were each up for re-election), did not exercise active and appropriate oversight over the Company, its operations, Code of Ethics, risk management, public disclosures, or controls.  Instead, as described herein, the Board made or allowed to be made improper statements in Inogen's press releases, public filings, and other public statements; it failed to oversee compliance with the Code of Ethics, including its Insider Trading provision; it failed to implement a functioning risk management processes designed to address significant risks to the Company; it utterly failed to ensure compliance with applicable securities laws through implementation of functioning disclosure controls and procedures; and it made little or no effort to implement effective controls to prevent misconduct by its sales staff and distributors. Accordingly, the Director Defendants were negligent in including these misleading statements in the 2018 Proxy and the 2019 Proxy.

219.    Both the 2018 Proxy and 2019 Proxy were also misleading because, in making disclosures concerning the Company's "strong" fiscal 2017 and 2018 business performance, the Director Defendants failed to disclose the materially adverse Undisclosed Facts which were necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

220.    In addition, both the 2018 Proxy and the 2019 Proxy claimed that the CN&G Committee "will consider candidates recommended by stockholders in the same manner as candidates recommended to the Committee from other sources." This same statement also appeared in Inogen's 2015-2017 proxy statements. Yet, this statement was false or materially misleading when made. Defendant Huggenberger used his influence as Inogen's President, CEO, and a director to have his former colleagues from Sunrise Medical Inc., Rider and Anderson-Ray, appointed to the Board, as described at ¶¶ 238-240, below.

221.    The 2018 Proxy and the 2019 Proxy harmed Inogen by interfering with the proper governance on the Company's behalf that follows from the free and informed exercise of the stockholders' right to vote for directors. As a result of the misleading statements in the proxies, Inogen's stockholders voted via an uninformed stockholder vote to reelect Greer, Rider, and Beardsley (in 2018) and Wilkinson, Anderson-Ray, and McFarland (in 2019) to Inogen's Board. Had the 2018 Proxy and the 2019 Proxy not been false and/or materially misleading, Inogen's stockholders would not have voted to reelect these directors to Inogen's Board.

222.    The 2018 Proxy and the 2019 Proxy also harmed Inogen by causing it to continue to pay compensation to these directors, who otherwise would not have been reelected, while they violated their fiduciary duties.

## IX.    DAMAGES TO INOGEN

223.    As a result of the Individual Defendants' wrongful and unlawful conduct, Inogen disseminated false and misleading public statements concerning the Company's business and prospects, internal controls, and corporate governance and omitted material information from those statements to make such statements not false and misleading.  The improper statements have devastated Inogen's credibility and caused the Company to lose more than $3.3 billion in market capitalization.

224.    The Individual Defendants' improper course of conduct has also potentially subjected the Company to millions of dollars in damages in connection with the Securities Class Action.  The Securities Class Action alleges that the Company, Wilkinson, and Bauerlein violated federal securities laws by repeatedly misrepresenting the Company's business and prospects.

225.    These actions have irreparably damaged Inogen's corporate image and goodwill. For at least the foreseeable future, Inogen will suffer from what is known as the "liar's discount," a term applied to the stock of companies who have been implicated in misleading the investing public, such that Inogen's ability to raise equity capital or debt on favorable terms in the future is now and will continue to be impaired.  The Company stands to incur higher marginal costs of capital and debt because of the misconduct.

226.    As a direct and proximate result of the Individual Defendants' conduct, the Company has expended, and will continue to expend, significant sums of money.  These additional expenditures include, without limitation: (i) expenses incurred in investigating and defending Inogen and the Securities Class Action Defendants in the Securities Class Action; (ii) compensation and benefits paid to the Individual Defendants, who have breached their fiduciary duties to Inogen, which compensation was based at least in part on Inogen's stock price

which was artificially-inflated by the Individual Defendants' misconduct; and (iii) costs associated with the loss of customer confidence in the Company.

## X.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

227.    Plaintiff brings this action derivatively in his own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Inogen as a direct result of the violations of the federal securities laws, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.

228.    Inogen is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

229.    Plaintiff is a current stockholder of Inogen and has continuously owned such shares since the time of the wrongdoing complained of herein.  Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

230.    Because the Individual Defendants lack independence and/or face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its stockholders.

231.    Inogen's current Board consists of defendants Wilkinson, Lukatch, Huggenberger, Anderson-Ray, Beardsley, McFarland, Rider, and Greer.  A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein.  Plaintiff therefore has not made any demand on the present Board to institute this action because such a demand would be a futile and useless act.

232.    The wrongful acts complained of herein have subjected, and continue to subject, Inogen to harm.

## A.  Demand Is Excused as to Defendants Wilkinson and Huggenberger Because They Lack Independence

233.  Inogen has conceded in its SEC filings that defendants Wilkinson and Huggenberger are not independent directors.  Specifically, in the 2019 Proxy, defendants Wilkinson and Huggenberger are not listed as being among the purportedly independent directors. According to the Company, the Board considered whether any director had a material relationship with it that could compromise his or her ability to exercise independent judgment in carrying out his or her responsibilities.  Based upon the information that Wilkinson and Huggenberger provided concerning their background, employment and affiliations, including family relationships, the Board could not deem them independent under the rules of the NASDAQ Global Select Market.

234.  Furthermore, defendants Wilkinson and Huggenberger are not independent directors because their principal professional occupations are their employment with Inogen. Wilkinson has served as Inogen's CEO since March 2017 and as a director since January 2017. He previously served as Inogen's President and COO from January 2016 until March 2017 and Executive Vice President of Sales and Marketing from 2008 to 2015.  In those roles, Wilkinson has received and continues to receive substantial monetary compensation and other benefits from the Company as follows:

| YEAR | SALARY | STOCK AWARDS | OPTION AWARDS | NON-EQUITY INCENTIVE PLAN COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|---|---|
| 2018 | $494,458 | $1,749,846 | --- | $443,034 | $2,687,338 |
| 2017 | $402,177 | $2,099,949 | --- | $346,240 | $2,848,366 |
| 2016 | $336,289 | --- | $1,441,615 | $301,500 | $2,079,404 |
| 2015 | $278,600 | --- | $1,101,469 | $160,707 | $1,540,776 |

Huggenberger has served as a director of the Company since 2008.  He previously served as Inogen's President from January 2008 until January 2016 and as its CEO between January 2008

and March 2017.  In those roles, Huggenberger has received and continues to receive substantial monetary compensation and other benefits as follows:

| YEAR | SALARY/CASH COMP. | STOCK AWARDS | OPTION AWARDS | NON-EQUITY INCENTIVE PLAN COMP. | OTHER COMP. | TOTAL COMP. |
|---|---|---|---|---|---|---|
| 2018 | $43,750 | $179,988 | --- | --- | --- | $223,738 |
| 2017 | $129,073 | --- | $281,030 | --- | $38,733 | $448,836 |
| 2016 | $552,116 | --- | $1,865,620 | $618,750 | --- | $3,036,486 |
| 2015 | $480,308 | --- | $1,468,626 | $484,837 | --- | $2,433,770 |
| 2014 | $435,118 | --- | $1,090,897 | $396,000 | --- | $1,922,015 |
| 2013 | $346,883 | --- | $186,685 | $260,163 | $10,236 | $803,967 |

235.    Additionally, defendant Wilkinson lacks independence because he is named as a defendant in the Securities Class Action and faces a substantial likelihood of liability for the conduct alleged therein against him.

236.    Accordingly, defendants Wilkinson and Huggenberger lack independence from defendants Lukatch, Anderson-Ray, Beardsley, McFarland, Rider, and Greer due to their past and present employment with Inogen and their interest in maintaining their executive and directorial positions.  This lack of independence renders defendant Wilkinson and Huggenberger incapable of impartially considering a demand to commence and vigorously prosecute this action.

**B.      Demand Is Excused as to Defendants Huggenberger, Anderson-Ray, Rider, Lukatch, and Beardsley Due to Their Overlapping Business Affiliations**

237.    Defendants Huggenberger, Anderson-Ray, Rider, Lukatch, and Beardsley are incapable of impartially considering a demand to commence and vigorously prosecute this action due to their long-standing, overlapping business relationships.

238.    Defendants Huggenberger, Anderson-Ray, and Rider all have long-standing ties to Sunrise Medical Inc., a global manufacturer and distributor of durable medical equipment, and each other.  Huggenberger held various management positions with Sunrise Medical, including: Vice President of Marketing for Sunrise Medical's German subsidiary from 1994 to 1996,

President of Sunrise Medical's German division from 1998 until 2000, President of the European Operating Group from 2000 to 2002, President and COO from 2002 until 2004, and President of European Operations from 2006 to 2007.  At the same time, Anderson-Ray also held various senior leadership roles at Sunrise Medical, including: President of the Global Business Group in 2001, President of the Continuing Care Group from 1998 to 2000, and President of the Mobility Products Division from 1996 to 2001.  According to Sunrise Medical's SEC Form 10-K, Huggenberger and Anderson-Ray were considered under SEC rules to be "executive officers" of the company.  And, from 2001 to 2005, defendant Rider served as Senior Vice President of Global Human Resources for Sunrise Medical.

239.   These professional connections going back 20 years led to Huggenberger, who became Inogen's CEO and President in 2008, reuniting with Anderson-Ray and Rider at Inogen upon their appointments as directors in 2013 and 2014, respectively.

240.   Although the Board's CN&G Committee provides that it "will consider candidates recommended by stockholders in the same manner as candidates recommended to the Committee from other sources," that statement is not true.  Defendant Huggenberger yielded significant power over the Board's appointment of new directors.  Curiously, of the five independent directors appointed to Inogen's Board since 2013, two of them are Huggenberger's Sunrise Medical colleagues.  As a result, Huggenberger enjoyed the additional benefit of having a long-time associate—Rider—who he facilitated being appointed to the Board in 2014, participate in setting and approving his compensation as a member (then later the Chair) of the CN&G Committee.  As shown in the compensation chart (¶ 234, above), between 2014 and 2016, when Huggenberger was President and CEO, he saw his total compensation increase significantly year-to-year.

241.    These long-standing relationships also led to additional professional opportunities. For example, since at least 2015, Anderson-Ray has been serving on the Board of Directors of Sommetrics, Inc., a privately-held company providing sleep apnea products and services.  When a directorial position opened in 2017, Anderson-Ray saw an opportunity to repay his colleague. Huggenberger was appointed to the Sommetrics' Board in November 2017 where he and Anderson-Ray now serve together on the Sommetrics' Board.

242.    Based upon the foregoing, there is reasonable doubt defendants Huggenberger, Anderson-Ray, and Rider, who are all about the same age and have risen through the corporate ranks together for nearly two decades, would vote to initiate litigation against each other or their other colleagues on the Inogen Board.

243.    Several current Board members also have long-standing connections to Inogen's largest stockholder, Novo Holdings A/S (formerly Novo A/S), a holding and investment company that manages ~$45B of assets on behalf of the Novo Nordisk Foundation.  As of February 2018, Novo Holdings A/S reported it beneficially owned 3,549,320 shares of Inogen common stock, or 16% of the Company.  Novo Ventures is the venture investment vehicle for Novo Holdings A/S.

244.    Defendant Beardsley has been the Managing Partner of Novo Ventures (US) Inc. since 2018.  He joined Novo Ventures (US) Inc. in San Francisco in 2012.  Beardsley has also worked within Novo Holdings A/S and its investment activities since 2009 in several roles: from 2016 through 2017, he was employed as a Senior Partner by Novo Ventures (US) Inc.; from December 2012 through 2015, he was employed as a Partner by Novo Ventures (US) Inc.; and from 2009 through 2012, he was employed as a Senior Partner by Novo Holdings A/S.  That Beardsley's foremost allegiance is to Novo Holdings A/S is further demonstrated by his decision "to waive any right to compensation for service on the [Inogen] Board or any committee thereof."

245.     Defendant Lukatch was also a partner at Novo Ventures (US) Inc. and helped establish its San Francisco office in 2006.  Lukatch left the company in 2015 after nine years but remains on the boards of several companies in which it has invested.

246.     There is reasonable doubt defendants Beardsley and Lukatch would vote to initiate litigation against each other due to these long-standing business relationships between each other and their ongoing professional dealings with and on behalf of Inogen's largest stockholder.  Similarly, there is reasonable doubt the remaining directors would initiate litigation against directors associated with Inogen's controlling stockholder which, as a result of its substantial stock holdings, yields significant influence on Inogen, its directors, and its executives.

### C.     Demand Is Excused Because a Majority of the Board Face a Substantial Likelihood of Liability for Their Insider Trading

247.     Defendants Wilkinson, Lukatch, Huggenberger, Anderson-Ray, McFarland, and Rider also face a substantial likelihood of liability with respect to their insider selling of Inogen shares while in possession of material, adverse nonpublic information concerning Inogen's business, financial prospects, and internal controls during the period when the Company's stock was artificially inflated.  As set forth above in ¶¶ 198-206, these defendants collectively sold 206,990 Inogen shares, for which they received 33,923,344 between November 15, 2017 and January 15, 2019, in violation of the Company's Insider Trading policy, and state and/or federal law.  For the reasons stated herein, these defendants face a substantial likelihood of liability and are not independent or disinterested, excusing a pre-suit demand.

### D.     Demand Is Excused Because the Entire Board Faces a Substantial Likelihood of Liability for Their Misconduct

248.     Defendants Wilkinson, Lukatch, Huggenberger, Anderson-Ray, Beardsley, McFarland, Rider, and Greer violated Section 14(a) of the Exchange Act by negligently making material misstatements in and omissions from the 2018 and 2019 Proxy Statements.  It is against

public policy to indemnify individuals for violations of section 14(a) of the Exchange Act. Accordingly, any indemnification by the Company to defendants Wilkinson, Lukatch, Huggenberger, Anderson-Ray, Beardsley, McFarland, Rider, or Greer does not protect them from liability or damages as a result of their wrongdoing.  As a result, these defendants face a substantial likelihood of liability, excusing a pre-suit demand.

249.   Defendants Wilkinson, Lukatch, Huggenberger, Anderson-Ray, Beardsley, McFarland, Rider, and Greer also breached their fiduciary duties of loyalty and good faith by making or allowing to be made false and misleading statements during the Relevant Period in Inogen's press releases, public filings, and other public statements relating to the Company's business, financial prospects, and internal controls.  Accordingly, all members of the Board face a substantial likelihood of liability for their breach of their respective and collective fiduciary duties, and any demand upon the Director Defendants to bring suit against themselves, or the executive management of the Company, would be a useless and futile act.

250.   Defendants Wilkinson, Lukatch, Huggenberger, Anderson-Ray, Beardsley, McFarland, Rider, and Greer caused and/or allowed the Company to engage in deliberately issuing false and misleading statements to mislead investors, and as such, they each face a substantial likelihood of liability for causing Inogen to engage in such illegal and unlawful conduct.  As described above, Defendants Wilkinson, Lukatch, Huggenberger, Anderson-Ray, Beardsley, McFarland, Rider, and Greer knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period, causing the Company's stock to trade at artificially-inflated prices.

251.   Additionally, Defendants Wilkinson, Lukatch, Huggenberger, Anderson-Ray, Beardsley, McFarland, Rider, and Greer, as directors (and, in some cases, as Audit Committee

members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that Inogen's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused Inogen's stock to trade at artificially-inflated prices.  Thus, Defendants Wilkinson, Lukatch, Huggenberger, Anderson-Ray, Beardsley, McFarland, Rider, and Greer are directly responsible for Inogen's failure to adopt and implement such internal controls, and for the substantial damages Inogen is subject to ongoing lawsuits.  As such, these Defendants face a substantial likelihood of liability for the claims asserted herein.  Demand is therefore futile as to them.

252.    Further, Defendants Wilkinson, Lukatch, Huggenberger, Anderson-Ray, Beardsley, McFarland, Rider, and Greer wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

253.    The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented

effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste, and abuse of control, constitute breaches of fiduciary duties for which they face a substantial likelihood of liability.   If Defendants Wilkinson, Lukatch, Huggenberger, Anderson-Ray, Beardsley, McFarland, Rider, and Greer were to bring a suit on behalf of Inogen to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For the foregoing reasons, demand is futile as to each of these Defendants.

### E.    Demand is Futile as to the Audit Committee Defendants

254.    During the Relevant Period, Defendants Anderson-Ray, McFarland, and Greer served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing the Company's internal controls over financial reporting, and discharging their other duties described herein.  Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of, false and/or materially misleading earnings press releases and quarterly and annual financial statements, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient, and that statements made by the Company regarding its business and financial prospects were accurate.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

**F.      Demand Is Excused as to Defendants Rider, Lukatch, and Beardsley Due to Their Membership on the Board's CN&G Committee**

255.     Defendants Rider, Lukatch, and Beardsley serve together on the CN&G Committee.   These three defendants all participated in setting their compensation from the Company, as well as the compensation of their colleagues, Wilkinson, Huggenberger, Anderson-Ray, McFarland, and Greer.   Their capacity to dole out compensation for themselves and their colleagues makes it impossible for each of them, and any of them, to independently and disinterestedly consider a stockholder demand to investigate or prosecute an action pertaining to the Individual Defendants' improper conduct.

**G.      Demand is Futile as to All Director Defendants for Additional Reasons**

256.     The Board of Inogen has already demonstrated that it cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein.   Despite the wrongdoing of the Company's executive officers, including Defendants Wilkerson and Bauerlein, who, respectively, still serve as the Company's CEO and CFO, the Board has taken no action to address the harm this misconduct has caused the Company.

257.     In addition, each of the current directors receives annual cash compensation, as well as awards of Inogen stock, purely for being a Board member.   This compensation provides a substantial stipend to these directors, from which each of them personally benefits and depends on for his or her livelihood.   The total compensation to these Directors in the form of retainer fees, stock awards and other compensation for 2018 was as follows:

| Name | Cash Compensation ($) | | Stock Awards ($) | | Total ($) | |
|------|------|---|------|---|------|---|
| McFarland | $ | 56,250 | $ | 179,988 | $ | 236,238 |
| Anderson-Ray | | 53,250 | | 179,988 | | 233,238 |
| Lukatch | | 116,250 | | 179,988 | | 296,238 |
| Rider | | 60,250 | | 179,988 | | 240,238 |
| Greer | | 60,750 | | 179,988 | | 240,738 |
| Beardsley | | — | | — | | — |
| Huggenberger | | 43,750 | | 179,988 | | 223,738 |

258.     Demand on each of the directors is therefore futile because, through their course of conduct to date, they have demonstrated their unwillingness to undertake any action that would threaten the economic benefits they receive as members of Inogen's Board.

259.     Also, if Inogen's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders.   However, Plaintiff is informed and believes that the D&O Insurance policies covering the Director Defendants in this case contain provisions that eliminate coverage for any action brought directly by Inogen against the Director Defendants, known as the "insured versus insured exclusion."   As a result, if the members of Inogen's Board were to sue themselves or certain officers of Inogen, there would be no D&O Insurance protection and, thus, this is a further reason why they will not bring such a suit.   On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the members of the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

260.     Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting Inogen by prosecuting this action. Therefore, demand on Inogen and its Board is futile and is excused.

261.     Inogen has been, and will continue to be, exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the members of the Board are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

262.     Plaintiff has not made any demand on stockholders of Inogen to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Inogen is a publicly-traded company with thousands of stockholders of record and at least hundreds of thousands of beneficial owners;

(b)     making demand on such a number of stockholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Inogen stockholders; and

(c)     making demand on all stockholders would force Plaintiff to incur excessive expenses and obstacles, assuming all stockholders could even be individually identified with any degree of certainty.

## XI.     CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 14(a) of the Exchange Act
### (Against the Director Defendants)

263.     Plaintiff incorporates by reference all prior paragraphs except as provided below.

264.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

265.     The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders, which were contained in the 2018 Proxy and the 2019 Proxy.  In the 2018 Proxy, the Board solicited stockholder votes to reelect Rider, Greer, and Beardsley to the Board.  In the 2019 Proxy, the Board solicited stockholder votes to reelect Wilkinson, Anderson-Ray, and McFarland to the Board.

266.     The 2018 Proxy and the 2019 Proxy incorrectly claimed and/or led reasonable investors to believe that: (i) the Board was engaged in appropriate and active risk oversight of the Company, including compliance with the Code of Ethics; (ii) the Audit Committee exercised appropriate oversight of the Company's accounting and financial reporting, disclosure controls and procedures, and the overall effectiveness of the Company's internal controls; (iii) the Company achieved strong year-over-year growth in revenues, net income and liquidity while effectively managing its costs based, at least in part, on the effective oversight by the Board; and (iv) as a result, defendants Greer, Rider, and Beardsley (in 2018) and Wilkinson, Anderson-Ray, and McFarland (in 2019), as members of the Audit Committee and/or Board, were well-informed about and exercised appropriate oversight over Inogen's operations, risk management, public disclosures, and controls.

267.    However, the Board did not exercise active and appropriate oversight over the Company, its operations, Code of Ethics, risk management, public disclosures, or controls. Instead, as described herein, the Board made or allowed to be made improper statements in Inogen's press releases, public filings, and other public statements; it failed to oversee compliance with the Code of Ethics, including its Insider Trading provision; it failed to implement a functioning risk management processes designed to address significant risks to the Company; it utterly failed to ensure compliance with applicable securities laws through implementation of functioning disclosure controls and procedures; and it made little or no real effort to implement effective controls to prevent misconduct by its sales staff and distributors.

268.    The 2018 Proxy and the 2019 Proxy were also misleading because, in making disclosures concerning the Company's "strong" fiscal 2017 and 2018 business performance, the Director Defendants failed to disclose the materially adverse Undisclosed Facts which were necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

269.    In addition, the 2018 Proxy and the 2019 Proxy claimed that the CN&G Committee "will consider candidates recommended by stockholders in the same manner as candidates recommended to the Committee from other sources."  Yet, this statement was false or materially misleading when made.  Defendant Huggenberger had used his influence as Inogen's President, CEO, and a director to have his former colleagues from Sunrise Medical, Rider and Anderson-Ray, appointed to the Board.

270.    By reason of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct,

Inogen misled and deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Inogen's recommendation to reelect certain Board members.

271.    The misleading information contained in the 2018 Proxy and the 2019 Proxy was material to Inogen's stockholders in determining whether to elect these defendants.   This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy solicitation process in connection with the 2018 Proxy and the 2019 Proxy was an essential link in the reelection of nominees to the Board.

272.    Plaintiff, on behalf of Inogen, hereby seeks relief for damages inflicted upon the Company based upon the misleading 2018 Proxy and 2019 Proxy in connection with the improper reelection of the members of the Board.

## COUNT II

### For Contribution for Violations of Sections 10(b) and 21D of the Exchange Act
### (Against Defendants Wilkinson and Bauerlein)

273.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

274.     Defendants Wilkinson and Bauerlein are named defendants in the Securities Class Action.

275.    Inogen is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for, *inter alia*, violations of section 10(b) of the Exchange Act.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the defendants as alleged herein.  The Company is entitled to receive contribution from the Securities Class Action Defendants in connection with the Securities Class Action against the Company.

276.    Defendants Wilkinson and Bauerlein, as directors and officers and otherwise, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, including the content of public statements about Inogen, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act and Rule 10b-5.  Further, defendants Wilkinson and Bauerlein are liable under section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

277.    As a result, defendants Wilkinson and Bauerlein damaged Inogen and are liable to the Company for contribution.

278.    Plaintiff, on behalf of Inogen, has no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duty
### (Against the Individual Defendants)

279.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

280.    The Individual Defendants breached their duty of loyalty and good faith by allowing each other to cause, or by themselves causing, the Company to make false and misleading statements in Inogen's press releases, public filings, and other public statements relating to the Company's business, financial prospects, and internal controls.  The Individual Defendants knew or were reckless in not knowing the Undisclosed Facts and that the related statements were improper.  Additionally, the Individual Defendants breached their fiduciary duties by failing to ensure the Company had effective internal controls over its public disclosures and its sales processes so as to prevent the abusive sales tactics employed by its sales representatives and

distributors.  These defendants further breached their fiduciary duties by allowing Inogen insiders to conduct insider sales of Company stock while in possession of material, adverse nonpublic information.  Each of the Individual Defendants violated his or her fiduciary duties by consciously failing to prevent the Company from engaging in the wrongful and unlawful acts complained of herein.

281.    The Individual Defendants had a duty to properly oversee compliance with Inogen's Code of Ethics.  The Code of Ethics, which applies to all directors, officers, and employees, requires that all public disclosures be full, fair, complete, accurate, objective, relevant, timely, and understandable.  It also requires that (i) employees and directors comply with all laws, rules, and regulations applicable to Inogen and its business, as well as applicable Inogen policies and procedures and (ii) no employee or director in possession of material, nonpublic information trade in Inogen's securities from the time he or she obtains such information until after adequate public disclosure of the information is made.  The Individual Defendants breached their duties by failing to comply with, and failing to oversee and require others to comply with, the Code of Ethics. Accordingly, the Individual Defendants breached their duty of loyalty to the Company.

282.    The Audit Committee members had a duty to properly oversee Inogen's compliance with legal and regulatory requirements, including public disclosure controls and procedure, as well as its internal control functions and disclosures.  As described herein, the Audit Committee Defendants breached their duty of loyalty and good faith by approving or otherwise allowing the improper statements, and by failing to properly oversee Inogen's compliance with legal and regulatory requirements, public disclosure and sales staff controls and procedure, and other internal control functions and disclosures.

283.    The Securities Action Defendants were reckless or grossly negligent in disseminating the improper statements detailed herein.   The Securities Action Defendants intentionally, recklessly, and/or with gross negligence made improper statements in Inogen's press releases, public filings, and other public statements.   Accordingly, these defendants breached their duty of care and loyalty to the Company.

284.    The Individual Defendants' conduct as detailed herein was not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

285.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Inogen has sustained and will continue to sustain significant damages. Accordingly, these defendants are liable to the Company.

286.    Plaintiff, on behalf of Inogen, has no adequate remedy at law.

## COUNT IV

**Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information (Against the Insider Selling Defendants)**

287.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

288.    At the time the Insider Selling Defendants sold their Inogen stock, they knew the information described herein, including the Undisclosed Facts, and sold such stock on the basis of such information.

289.    The information described herein was material, adverse nonpublic information concerning the Company's business metrics, its prospects, and its controls and governance.   It was an asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Inogen stock.

290.     At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's business metrics and prospects, and its internal controls and governance.

291.     The Insider Selling Defendants' stock sales while in possession and control of this material, adverse nonpublic information was a breach of their fiduciary duty of loyalty and good faith.

292.     Since the use of the Company's material nonpublic information for their own gain constitutes a breach of fiduciary duty, the Company is entitled to the imposition of a constructive trust on the profits from the Insider Selling Defendants' improper sales.

293.     By reason of the foregoing, Inogen was damaged.

294.     Plaintiff, on behalf of Inogen, has no adequate remedy at law.

## COUNT V

### Waste of Corporate Assets
### (Against the Individual Defendants)

295.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

296.     As a result of the Individual Defendants' failure to implement adequate controls to ensure that the Company's SEC filings and other public statements were not misleading, Inogen is subject to the Securities Class Action.  The Individual Defendants have caused Inogen to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

297.     As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

298.     Plaintiff, on behalf of Inogen, has no adequate remedy at law.

## COUNT VI

### Unjust Enrichment
### (Against the Individual Defendants)

299.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

300.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense and to the detriment of Inogen.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching their respective fiduciary duties owed to Inogen, violating its Code of Ethics, and engaging in self-dealing.

301.    Plaintiff, as a stockholder and representative of Inogen, seeks restitution from these defendants, and each of them, and an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, as a result of their wrongful conduct.

302.    Plaintiff, on behalf of Inogen, has no adequate remedy at law.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against Defendants, jointly and severally, and in favor of the Company, for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, unjust enrichment, waste of corporate assets, violations of the Exchange Act, and insider selling, together with prejudgment and post-judgment interest thereon;

B.      Directing the Company to receive contribution and/or indemnification from the Securities Class Action Defendants for their wrongful acts and omissions, which exposed Inogen to civil liability under the federal securities laws;

C.      Directing Inogen to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Inogen and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's bylaws or articles of incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Company's reporting and disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and the public;

- a proposal to strengthen the Company's policies, procedures, and controls over its sales representatives and distributors to help protect vulnerable customers and potential customers, and to ensure that abusive sales tactics are not utilized at any point during the sales process;

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to ensure the accuracy of the qualifications of Inogen's directors, executives, and other employees;

- a proposal to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

- a proposal to declassify the Board;

- a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

- a provision to permit the stockholders of Inogen to nominate three candidates for election to the Board;

D. Against each of the Individual Defendants in favor of Inogen for the amount of damages sustained by Inogen, jointly and severally, in an amount to be determined at trial, together with prejudgment and post-judgment interest thereon;

E. Requiring the Individual Defendants to return to Inogen all compensation and remuneration of whatever kind paid to them by Inogen during the time that they were in breach of their fiduciary duties;

F. Requiring the Insider Selling Defendants to disgorge all profits realized through their sales of Inogen stock at artificially inflated prices while in possession of material, adverse nonpublic information and requiring that such profits be held in constructive trust for the Company's benefit;

G. Directing the Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Inogen's directors, officers, and employees do not engage in wrongful or illegal practices;

H. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets to as to assure that Plaintiff on behalf of Inogen has an effective remedy;

I. Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

J. Granting such other and further relief as this Court deems just and equitable.

## XIII.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 13, 2019

**COOCH AND TAYLOR, P.A.**

By:   */s/ Blake A. Bennett*
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
(302) 984-3800

*Attorney for Plaintiff*

**OF COUNSEL:**

**JOHNSON FISTEL, LLP**
Frank J. Johnson
Phong L. Tran
655 West Broadway, Suite 1400
San Diego, CA 92101
(619) 230-0063

**JOHNSON FISTEL, LLP**
Michael I. Fistel, Jr.
40 Powder Springs Street
Marietta, GA 30064
(470) 632-6000

00587509                                        105